WILLIAM J. GALT, Appellant, v. ROBERT PROVAN et al.

**Wills: TESTAMENTARY CAPACITY.** One who at seventy-seven, loses her husband, and who then begins to manifest less and less independence of action, whose memory becomes continually poorer; loses sympathy for her family, forgets the burial of her children in Scotland, whom she formerly remembered with the greatest affection; who becomes penurious; who repeats old stories frequently in the same conversation; who evinces no sorrow nor appreciation at the death of her husband; who continually repeats questions in the same conversation; objects to her son's acting as administrator of her husband's estate; forgets the execution of papers within a few minutes; complains of inattention of her children, who frequently call upon her; who becomes very much attached to a grandson who lives with her, and attends his wedding, but does not know he was married nor to whom, though he married the girl who was then working for her, and whose mental decadence continues for seven years, at which time she makes a disposition of her property in favor of that grandson, although she has children living whom she ignores, has not the capacity to dispose of her property by deed or will.

**SAME.** The mind of a woman gradually weakened from 1885, when she was 77 years old, until 1896, when all her intellectual faculties were obliterated by *senile dementia.* In 1889 she wrote letters, indicating that her mind was sound, but in 1892 she had very little power to remember recent events. In 1892 she executed a

deed conveying her farm to her grandson, who for several years had been living with her, and working it for her. Prior to 1895 she could recognize acquaintances, and appeared to them to understand, so as not to show unsoundness of mind; but in 1895 a guardian was appointed for her. *Held*, that in 1892 she was not competent to dispose of land by deed.

**Duress:** RECONVEYANCE. An instrument which is executed by a man of twenty-seven, not acting under physical restraint, will not be set aside for duress, the weight of evidence as to threats being that none were made, and no corroborating circumstances being shown.

RULE APPLIED. In an action by a grandson, 27 years of age, and of average mental capacity, to set aside a quitclaim deed executed by him to his grandmother reconveying land which she had previously conveyed to him when she was of unsound mind, he testified that his father and four other relatives had induced him to execute the deed by threatening to prosecute him for obtaining the deed from his grandmother by undue influence. His father and the relatives denied the threats, and a notary public testified that the grandson had, after it had been read to him, executed and acknowledged an instrument confessing that he had used undue influence in obtaining the deed from his grandmother. *Held*, insufficient to show duress.

SAME: *Parties.* An action to set aside a deed reconveying land that had been previously conveyed to a grandson by his grandmother when she was of unsound mind, and to have the deed executed by her adjudged to be valid, cannot be successfully maintained by the grandson, though his deed reconveying the land to her was executed at the instance of interested third parties, who were intermeddlers.

*Appeal from Tama District Court.*—HON. G. W. BURNHAM, Judge.

TUESDAY, MAY 23, 1899.

ACTION to establish and quiet the title of certain lands in the plaintiff. There was a judgment for defendants, and the plaintiff appealed.—*Affirmed.*

*Endicott & Pratt* and *Struble & Stiger* for appellant.

*A. K. Hitchcock, C. B. Brandshaw,* and *Preston, Wheeler & Moffit* for appellees.

GRANGER, J.—I.    In 1885 John Galt died seized of one hundred and sixty acres of land in controversy in this suit known as the "Home Farm."    At his death he left surviving, his widow, Janet Galt, David Galt, who is the father of the plaintiff, Elizabeth Provan, and Jean McCormack. The children, David, Elizabeth, and Jean, are defendants in this case.    Defendants Robert Provan and Peter McCormack are, respectively, the husbands of Elizabeth and Jean, and defendant Mary Galt is the present wife of David Galt, the plaintiff being his son by a former marriage.    The widow, Janet Galt, is now under the legal guardianship of Robert Provan, who is also defendant in that capacity.    Plaintiff's mother died in 1868, soon after which, in pursuance of her request, he went to live with his grandparents, John and Janet Galt, and continued to live with them until the death of his grandfather, in 1885, and afterwards with his grandmother till about February 19, 1895.    John Galt died testate, leaving to his widow the home farm, being all his real estate, and all his personal property.    Janet Galt, at the death of her husband was about seventy-seven years of age.    Soon after the death of John Galt, plaintiff, with his grandmother, moved to Traer, for better educational advantages, and he attended school there and at Des Moines till 1889, when they returned to the farm.    Plaintiff took charge of the farm, and was allowed therefor, by his grandmother, two hundred and fifty dollars per year for his services.    In January, 1892, his grandmother made to him a deed of the farm, which was not filed for record, and in October, 1894, she made a will, in which she gave to each of her three children one thousand dollars, and the remainder of her property to plaintiff.    Plaintiff had at all times been industrious, faithful, and kind to his grandparents, and was held in high esteem by his grandmother.    Up to 1889 plaintiff had been supported and given good educational advantages, and in return he had given a service and deport-

ment that was entirely satisfactory; and it is to be said that after 1889, when they returned to the farm, and he began to receive wages, the same kindly feeling existed between him and his grandmother. It may be well in this connection to state that up to February, 1895, there was never an unfriendly feeling, misunderstanding, or complaint by any member of the family, including the brother and sisters, as to the plaintiff, and there was at all times friendly inter-course. Up to February 20, 1895, plaintiff remained single. A day or two before that it became known that he was to be married on the twentieth, and Elizabeth and Jean, with their husbands, went to the house of David Galt on the morning of the 19th, and informed him of the contemplated marriage of the plaintiff, and it was then thought advisable that there be a settlement as to the matters beween plaintiff and his grand-mother; and plaintiff's father (David) went to the house of plaintiff and his grandmother, and asked him to take his books and go home with him, to look over the accounts, which the plaintiff did. On reaching David Galt's house, there were present the sisters and their husbands and David's wife. Upon inquiry the plaintiff made known the facts as to the execution of the deed and will, and plaintiff and his father returned to the grandmother's house, and plaintiff obtained them, and they returned with them. While at David Galt's that day, plaintiff executed a quitclaim deed to his grandmother of the home farm, and also a deed for about nineteen acres of land adjoining, that he had purchased with his own earn-ings; and had also signed and acknowledged the following:

"I, Wm. J. Galt, hereby make the following voluntary admissions: 1st. That I used undue influence on one Janet Galt, widow of John Galt, deceased, and by such influence induced the said Janet Galt to make a certain will on the 9th day of October, A. D. 1894, by which I was a beneficiary and legatee. 2nd. That on the 14th day of January, 1892, through my influence, unduly exercised, the said Janet Galt gave me a certain warranty deed, which

I have hereby given to Robert Provan, with my free consent to destroy. [Signed]  William J. Galt.

"State of Iowa, County of Tama—ss.:  On the 19th day of February, A. D. 1895, personally appeared the above-named William J. Galt, and acknowledged his signature to the above instrument to be his voluntary act and deed. [Signed] A. K. Hitchcock, Notary Public in and for Tama County, Ia."

The deed of Janet Galt to the plaintiff was delivered to Robert Provan, and destroyed.  The will was taken by David Galt, and the next day, in pursuance of an understanding with his sisters and their husbands, he took it to his mother, who, in the presence of plaintiff and himself, destroyed it.  As a part of the transaction on the nineteenth of February, at the house of David Galt, the following— omitting formal parts—was signed by plaintiff and David Galt and his two sisters: "That for and in consideration of the agreement by the said David Galt, Jean McCornack, and Elizabeth Provan, said parties of the second part, that said Wm. J. Galt, said party of the first part, shall receive one-fourth interest in the estate of John Galt, deceased, and Janet Galt, widow of said John Galt, and the further consideration that the said David Galt, Jean Galt and Elizabeth Provan, parties of the second part, shall relinquish to the said Wm. J. Galt, and by these presents do relinquish, all their right, title, and interest, either present or future, in the personal property upon the following described real estate, to-wit, 'the east one-half ($\frac{1}{2}$) of the southeast quarter of section thirty-two (32), township eighty-six (86) north, of range fourteen (14) west of the 5th P. M., with the exception of the household furniture upon said real property, I, Wm. J. Galt, party of the first part, hereby agree to relinquish all claims upon the estate of John Galt, deceased, and upon the estate of Janet Galt, widow of said John Galt, deceased; and further the said Wm. J. Galt relinquishes all interest he may have in one certain last will

and testament of the said Janet Galt, made and executed on the 9th day of October, A. D. 1894. The said Wm. J. Galt further agrees to deed to the said Janet Galt the certain real estate amounting to eighteen acres, more or less: provided, that, should said Wm. J. Galt at any time in the future make any further claim on the estate of John Galt, deceased, or Janet Galt, the widow of said John Galt, then this instrument to be null and void, and these presents of no effect." At this time it was also understood that a guardian should be appointed for Janet Galt, and Robert Provan was so appointed, and there was, further, an understanding that plaintiff should lease from the guardian the farm for a cash rent; and in pursuance thereof, in March following, a written lease was executed, signed by plaintiff and the guardian, and the place was so occupied, and one or two payments of rent made thereon. This action was commenced in February, 1896, to set aside the deeds made by plaintiff to his grandmother, and to establish his title to the land deeded by her, and also what he formerly purchased; and the petition charges that the deeds made by plaintiff, and all that was done by him on the nineteenth day of February, 1895, and in the further carrying out of the agreements that day made, was under duress; that he was told that the obtaining of the deed and will by undue influence was a crime, punishable by imprisonment in the penitentiary; and that one of them said he would prosecute him if it took a farm and another farm on top of it, and also that what he had done would blacken his good name. The answer denies all these averments as to duress or making of threats, and shows that the surrender of the deed and will was voluntary, that plaintiff executed the papers that day signed by him voluntarily, and that the deeds and agreements were made in pursuance of a full and complete settlement. It is further made to appear by the answer that when the deed and will were executed by Janet Galt she was of unsound mind, and incapable of doing such acts,

and that they were both the result of undue influence by the plaintiff. The averments as to undue influence and unsoundness of mind are denied.

In considering the question of unsoundness of mind of Mrs. Galt, we can only notice a fraction of the testimony bearing on the question by either side. It may be well to preface what we are to say by this somewhat general statement, that the evidence throughout shows that about 1885, when about seventy-seven years of age, and near the time of her husband's death, there was a visible change in her mental condition, manifested particularly by a deficiency of memory. The witnesses on the different sides made the situation appear differently, but unmistakably there was a change, which grew more manifst as the years went by. Mrs. Galt seemed to be a woman of rather marked physical vigor, with good hearing and eyesight. Some of the particular facts relied on to show unsoundness of mind are as follows: "Prior to 1885 she was of independent, strong mind and fair memory, sympathetic and demonstrative when her sympathies were excited, especially about her children and relatives; had confidence in her children; was saving but not penurious; was neat in her habits and person; could carry on a conversation intelligently and connectedly; was not in the habit of repeating old stories to the same person in the same conversation more than once; did not worry about becoming poor; and had full knowledge of the death and burial of her children who died in Scotland previous to her emigration to this country, which occurred in 1856. After about 1885, which was the year that her husband died, she did not seem to appreciate the fact of his loss, and when it was mentioned to her merely looked, and said nothing, and did not evince sorrow because of his death; seemed forgetful of recent or current events of which she had full knowledge; appeared careless about her dress; was penurious, and would sometimes say, when she was told that she needed

anything, that she could not afford it,—the income being at this time the value of the products of her farm and about eight per cent. on about four thousand five hundred dollars, which she had out at interest. She displayed a tendency to talk about the old country, and things that happened in her young days, and seemed to remember them better than recent or current events; would ask the same questions over and over again in the same conversation with the same person; did not want her son, who was appointed administrator of his father's estate, to keep the papers which belonged thereto; could not be made to understand why she had to sign certain receipts connected with the settlement of the estate, and after signing same, would forget the transaction within a short time; would say of her children who had called on her recently and frequently that she saw them but seldom. When it was suggested to her, in 1891, that a tombstone be erected for her three children that were buried in Scotland, she said that she had no children there, when in fact she had three. In the spring of 1892 she was told that her grandson Willie was going out to some entertainment in the evening, and probably would not be back until ten or eleven o'clock. She asked within about five minutes where he was and when he would be back, and would keep asking that every few minutes during the evening, after having been fully answered several times. She was present at the marriage of her grandson Willie on the 20th day of February, 1895, and two or three days after asked if Willie was married, and she said she didn't know. She was living in the same house with Willie at the time he was married. She then asked who Willie was married to. Willie had married the girl who was then working for her, and had been for some time. On the day of Willie's marriage she said she wished she had some sewing to do. The person addressed said surely she wasn't going to sew today, and she replied, 'Is this the Sabbath?' and was answered, 'No, it is not the Sabbath, but Willie is going to get married today.' She didn't know anything about

it, although she had been told the marriage was to take place
at that time a short time before." These are but a part of
very many facts relied on. These facts are not disproven
by other evidence, but it is in evidence that in some particu-
lars, up to 1895, at least, she appeared to understand, and
really gave no evidence of unsoundness of mind. Some, who
were neighbors, who knew her intimately, met her often,.
were recognized by her and saw no unsoundness of mind.
As to the number of witnesses, those for defendants pre-
ponderate but slightly in number. Those for defendants.
had, as a rule, better opportunities to judge of the facts from
a more intimate acquaintance with her, and their testimony
is less general in its tenor by showing the particular facts on
which are based their conclusions. Dr. Fairchild was a wit-
ness for the defense. It appears that he is a man of extended
information on the subject of brain disease. He visited
Mrs. Galt in November, 1896, at the instance of counsel for
defendants, and examined into her condition, preparatory
to testifying in the case. To him was submitted a hypotheti-
cal question embracing the facts above set out, with many
others more remote from the period under consideration.
To the question, "What is your opinion of the soundness of
mind of the defendant Janet Galt from 1891 to 1895,
inclusive, based on such facts?" he answered: "I would
say, if the hypothetical question as read is true, that she
wasn't of sound mind from the period of 1892 to 1895,.
inclusive. Would say she was suffering from senile dementia.
The first evidence, as gained from the question, it would
probably be in 1885. This disease involves a structural
change of the brain. When I saw Mrs. Galt, the disease had
progressed to such an extent as to obliterate all her purely
intellectual faculties. After this structural change had
taken place, it would not be possible for the sufferer to have a
lucid interval. When I saw Mrs. Galt all her intellectual
faculties were obliterated. In the very earliest stages of the
disease it would be possible for a person to do certain things.

in a reasonable and natural manner. In a later stage it would be less possible for them to do so, and the time would come when they could not do those things at all. A person who had been accustomed to do certain work would continue to do it in a mechanical manner. She would be able to meet and greet people in an uncertain manner." "The history of the case in the hypothetical question would be important in determining the progress of the disease in the old lady's case. The condition of her brain was not the same prior to 1888 and 1889 as it is today. I know it wasn't from the facts stated in the hypothetical question. I would say the unsoundness of mind of the old lady began as early as 1885, perhaps sooner. Where the structural change takes place, the extent of the unsoundness of the mind is determined by the ability of the patient to think, and by the history of the case, and the exercise of mental processes. If a person thus afflicted is able to think connectedly, coherently, and transact business correctly, that would indicate the trouble and unsoundness of mind was very slight. When the structural change has progressed any considerable degree, it is impossible for a person thus suffering to think connectedly, or to perform correct mental processes. And if a person claimed to be thus afflicted could perform extended mental processes correctly, and in harmony with existing facts, it would indicate, to my mind that there had been but little change or disturbance of the mental faculties. In order to determine with any degree of certainty if a person at a given time is capable of executing a will or making a gift, I should want to know the ability of that person to perform mental processes,—to reason correctly and deal intelligently with facts and affairs of life that surround them. One of the tests of mentality and of correct mental operation is from what a person is able to put on paper. If the old lady, from 1885 to 1889, kept house,— attended to her household affairs, made the necessary purchases therefor, and paid her rent regularly,—that would be a strong indication that her mental processes were right and

correct, so far as that goes." "If senile dementia was long extended, the patient would not be apt to remember the name and faces of her children. If, at a given time, she knew her children in connection with other things, that would be an indication her mind was sound. If, at any given time, the old lady knew all her children, and knew what property she had, and was able to talk of her children and property, and about the disposition she desired to make of it to her children and grandson, that would be a very strong indication that the structural changes in the brain hadn't progressed so far as to materially injure the mind. If the structural changes have progressed far enough to injure the mind in its mental processes, the patient is unable to think and talk connectedly and coherently. If a person is able to express himself logically in regard to the ordinary affairs of life and business matters, that is an evidence that the mind is very slightly, if at all, impaired." The answer given embraces the original cross-examination, and it has the appearance of being impartial, and the conclusions seem reasonable. We are, of course, to determine the truthfulness of the data on which they are based from the evidence. In this respect, when all is considered, there is little room for doubt. Early in 1895 Mrs. Galt was placed under guardianship, involving the usual judicial inquiry, and, whatever that may have been, it has been continued, so far as appears, without question. That condition came, not suddenly, but gradually. It commenced as early as 1885, or before; and nothing discloses that at any time there was a perceptible sudden change. The plaintiff was a subscriber to the affidavit of unsoundness of mind which was the basis for the guardianship proceeding. It is true that he says that this, as well as other things done by him, was under duress. Dr. Fairchild is fully corroborated by other expert testimony from physicians. We do not understand the correctness of the expert testimony as to conclusions to be questioned, if the facts on which they are based are found to be true. Much reliance, in this

respect, is placed on letters written by Mrs. Galt in 1888 and early in 1889, while yet at Traer. We think these letters the strongest features of plaintiff's evidence against unsoundness of mind, and we have examined them closely. They were written three years before the deed was made, and nearly six years before the execution of the will. Considering the gradual change in her mind, the letters lose much of their force as evidence in consequence of the time between the writings and the execution of the papers. Our conclusion is that when the deed was made, in 1892, and thereafter, Mrs. Galt was not of sound mind, so as to be competent to dispose of property by deed or by will.

II. We are next to consider the question if plaintiff, on the 19th day of February, 1895, in making the deeds he now asks to have set aside, acted under duress. It may be well to state here that David Galt, the father of plaintiff, had been the executor of the will of his father, at his mother's request, she having been named as executrix in the will. Because of this, as well as for other reasons, he had much to do with the business affairs of his mother outside of the home and farm management, and everything had been conducted in a spirit of friendliness. When the parties came together at the house of David Galt on the 19th of February, there had never been any trouble whatever, and before the disclosure as to the deed and will there is no reason to think that more was contemplated than a mere inquiry into and settlement of the business affairs of plaintiff with his grandmother. Hence, in looking at the question of duress, it may be said that there was nothing to influence or affect plaintiff outside of what occurred that day. Of the seven persons present all are witnesses, and all may be said to be interested more or less, but none more so than plaintiff. This is important, because, as witnesses of what occurred, there is a direct conflict, the plaintiff alone testifying that threats were made as charged, and the other six testifying directly to the opposite. It is true that one

of the witnesses for defendants was not at all times present, but she was much of the time. On this as on the other branch of the case, we can only generalize. It is not practicable to detail the evidence. As the plaintiff is so far outweighed in numbers, if he establishes his claim of duress, there must be corroborating facts to aid his statements. The transaction, as a whole, is not complimentary to the parties engaged in it. It was unusual in its inception and its accomplishments. As to the inception, the parties, other than the plaintiff, were without the sanction of authority. As to what was accomplished, in view of what has since occurred and present conditions, the question of its binding effect is doubtful and difficult. We do not believe the fact of duress is established. Plaintiff was, at the time of the transaction, twenty-seven years old, of fair education, and a man of usual experience as a farmer. As appears by the record,—and his examination as a witness is quite extended,—he is intelligent, with nothing to place him below the usual man of his age in any particular. He says he did not influence his grandmother to make the deed or will. If that was true, he knew it on the nineteenth day of February, 1895, as well as now. There was at that time no pretense by any one that facts were known to show undue influence by him, and he knew it was not a fact, and could not be made to appear. It is in evidence that at one time in 1889 the grandmother said to plaintiff's father that Willie (plaintiff) was bothering her all the time about the farm,—wanted the farm,—and wanted him to talk with Willie, and that he did so. Plaintiff denies such a talk, and it may be said that if, on the nineteenth day of February, such things were said as that it was a criminal offense, and he would be prosecuted, and his good name blackened, he had no reason, as a reasonable man, to be intimidated. The ordinary man of his age and standing would have resented it with contempt, in the light of his own knowledge, and in the absence of anything to make it appear probable that there could be a conviction, or

his name blackened. We do not apply to him the rule that he must have acted as a reasonable man, but from the showing there is no reason for saying that he would not have been influenced as a reasonable man would have been. There is a strange inconsistency in his statements and conduct in this: that while he was doing anything that might be asked of him to avoid a conviction, and the blackening of his good name, he solemnly, in the presence of an officer, who was not a party to the transaction, and in no way bound to keep the document a secret, put his name to admissions of the facts that he understood would constitute the crime, and blacken his name. It is true that he says he did not read it, and that he executed it under duress. In this he is contradicted by the officer, who was a witness, by the instrument itself, and by other witnesses. If his statements are true, he made, under circumstances that ought to intimidate no man, a complete surrender of his manhood and his independence by putting himself absolutely under the dictation and control of others, whom he knew to be acting against his interest. It appears from the testimony of the officer that before the paper was drawn he asked plaintiff if he was willing to sign such a paper, and he said he was; that it was then drawn, and read to him, and he said it was all right, and he signed and acknowledged it. He knew the contents of other papers, and there appears no reason whatever why he should not have known the contents of this; and to believe that he did not is to accept his statement against that of all the other witnesses, and against facts that show his statements unreasonable. On the same day it was talked that plaintiff was to lease the farm, the contract to be executed later, when a guardian should be appointed for Mrs. Galt; and the first steps were taken that day to secure such appointment by the plaintiff making an affidavit of her unsoundness of mind. In March thereafter the lease was executed, and was partly performed. All this time, it is plaintiff's theory, he was under the same duress, and all this time, as he states, think-

ing his grandmother was not of unsound mind, so that the facts as to undue influence could have been definitely known. Whatever may have been the facts as to some particulars in the case, it is not to be found from the record that the plaintiff acted under duress in making the deeds and other papers.

A point is made in argument that David Galt and the others with him on February 19th were intermeddlers; and that is true, and, were the facts otherwise, we might conclude this case on that theory. But the case comes to us at the instance of plaintiff, seeking affirmative relief, not as to the intermeddlers, but he has brought in Janet Galt, and asks an adjudication against her that the deed made to him is valid; and, with our finding of her incompetency to make such a deed, the case must be determined as between plaintiff and Janet Galt. That is, practically, the only question in the case. What we have said disposes of all the issues made by the pleadings, and the decree is AFFIRMED.