FRED RICKMAN et al., Appellees, v. ESTELLA L. HOUCK, Appellant.

**SPECIFIC PERFORMANCE: Mental Incapacity.** Evidence reviewed, 1 and held to sustain an order for specific performance against a vendor, notwithstanding the fact that said vendor was adjudged insane *shortly after* the execution of the contract.

**VENDOR AND PURCHASER: Rescission—Ineffectual Attempt to Restore Status Quo.** A vendor who seeks to rescind does not necessarily place the vendee *in statu quo* by simply returning the initial payment. So held where the vendor knew that the vendee's deci-

sion to buy other adjoining tracts of land depended on vendee's ability to contract for vendor's land.

*Appeal from Des Moines District Court.*—OSCAR HALE, Judge.

OCTOBER 18, 1921.

SUIT for specific performance of a contract to sell real estate. Decree for plaintiff. Defendant appeals.—*Affirmed.*

*Hirsch & Riepe,* for appellant.

*Power & Power,* for appellees.

ARTHUR, J.—On the 4th day of August, 1919, Mrs. Susan Armpriest entered into a written contract with appellees, to sell and convey certain property located in the city of Burlington,

1. SPECIFIC PER-FORMANCE: mental incapacity.

Iowa, for the agreed price of $2,200, $500 in cash, and the balance, of $1,700, on or before September 1, 1919. On the 2d day of September, 1919, a deed was drawn up in accordance with the contract of sale of the premises, and signed by Susan Armpriest. This deed was not delivered, but was found by appellant, guardian, among the papers of her ward, and produced on the trial, and offered in evidence by plaintiffs. The deed is a warranty deed, dated September 2, 1919, signed by Susan Armpriest, and acknowledged September 2, 1919, by her, before La Monte Cowles, notary public, and conveys the property described in plaintiff's petition. On the refusal of appellant, guardian, to carry out the contract of her ward, this action for specific performance of the contract was instituted, on January 20, 1920.

The defense alleged was that, on the 13th day of October, 1919, Susan Armpriest was adjudged insane, and committed to the state hospital for the insane at Mt. Pleasant, Iowa, and was then confined in said hospital; that Susan Armpriest was declared to be a person of unsound mind by the district court on the 12th of November, 1919, and appellant, Estella L. Houck, was appointed as her guardian on November 14, 1919, and qualified as such guardian; that Susan Armpriest was a person of unsound mind on the 4th day of August, 1919, the date when the contract

was made; and that the contract sued on was void by reason of the fact that Susan Armpriest was at that time incapable of making a contract. Appellant tendered the $500 paid down on the contract back to the appellees.

Appellees were farmers, who were desirous of acquiring a tract of real estate for the purpose of erecting an elevator thereon, for storing and shipping grain which, according to their plans, required ground contiguous to the railroad, a portion of which ground should be so elevated above the railroad track as to enable them to load the cars from the elevator by gravitation. The property owned by appellant's ward and certain property adjacent thereto, which appellees desired to acquire if possible, possessed all the qualifications necessary for the successful carrying out of appellees' plans. Appellees regarded the property owned by appellant's ward as the key to the entire situation, if they could purchase the Armpriest property; as its elevation above the railroad track was considerably greater than that of the other real estate which they contemplated buying. Appellees did not want any of the real estate unless they were able to buy the Armpriest property, and appellant's ward was advised of that fact at the time the contract involved was executed by Susan Armpriest and delivered to appellees. Appellees had secured options for all of the real estate they desired to acquire for carrying out their plans, and appellant's ward was advised of that fact. During the first days of September, when the balance was to be paid to Susan Armpriest on the contract, appellees and Susan Armpriest and her daughter, Estella L. Houck, accompanied by La Monte Cowles, an attorney, of Burlington, Iowa, who for many years had been counsel for appellant's ward, and who was with her for the purpose of assisting her in the transaction, met at the office of Mr. Power, who was attorney for appellees. Mrs. Armpriest had with her the deed that was to be executed in performance of the contract. It was stated by Mr. Cowles, attorney for Susan Armpriest, that the indebtedness secured by a mortgage resting on the real estate had not been paid; and appellees declined to pay the money until the mortgage was canceled. Appellees advised Mrs. Armpriest, however, that the balance due would be, and it was, left with the Farmers & Merchants Savings Bank of Burlington, to be paid to her as soon as

the existing incumbrance was canceled. Susan Armpriest was, at the time, a depositor in the Farmers & Merchants Savings Bank.

Resistance to performing the contract is based on the alleged incapability of Susan Armpriest to make the contract on August 4, 1919. This leads us to the evidence, to ascertain whether Susan Armpriest, on August 4, 1919, was incapable of transacting the particular business in question. That such is the pertinent inquiry, see *Mitchell v. Mutch,* 180 Iowa 1281; *Swartwood v. Chance,* 131 Iowa 714.

A few months before making the contract involved in this case, Mrs. Armpriest sold some property which she owned, transacting the business in a satisfactory manner. On August 26th, appellant's ward purchased property in Burlington known as the Magel property, transacting such business properly. Appellant's ward had for some years conducted quite a large boarding house in property which she owned, and was so engaged at the time she executed the contract in controversy, and continued to conduct the boarding house until in October, when she broke down physically and mentally, and was taken to the hospital. The testimony of appellant herself and of her husband and of a brother and a sister of her ward's was offered, showing certain actions and sayings of her ward which she claimed were peculiar and different from former conduct of her ward, and which she claims evidenced insanity.

It was correctly found by the lower court, and, as we understand it, conceded by counsel for appellant, that appellees had no knowledge of the facts and circumstances relied upon by appellant to sustain the allegations of want of mental capacity to enter into the contract. Counsel for appellant placed strong reliance upon the testimony of Dr. Thornber, who was introduced as an expert witness, and who said that Susan Armpriest was not of sound mind on the 4th day of August, 1919, when the contract was entered into. Dr. Thornber was her family physician for several years. He did not see her on or about the 4th day of August, 1919, at the time the contract was entered into. He had not treated her since March, 1918, until in October, 1919, when she was completely broken down. She had never said anything to Dr. Thornber about her property affairs. The doctor

stated that, in his opinion, the condition she was in in October
had been growing for some time; that he thought she was more
nervous, the last year or two, than in former years. Basing his
answer on his knowledge of the condition of Mrs. Armpriest, and
on assumed facts which appellant claims were established by the
evidence, Dr. Thornber testified that Susan Armpriest was in-
sane on August 4, 1919. The facts assumed were acts and say-
ings of Mrs. Armpriest testified to mostly by her daughter,
appellant, and partly by her brother and sister and by her daugh-
ter's husband. The question assumed that Mrs. Armpriest com-
plained during the warm weather of dizziness, seemed to be more
forgetful than usual, was abusive, and cursed two small grand-
children whom she was keeping, children of her son, when for-
merly she never did anything of that sort; that she began to use
profanity in her usual conversation, when she had not done that
before; that she whipped one of the small children for doing
trivial things; that she reported that Mr. Toothacre, one of
the officers of the bank, had laughed at her, and she said she
made a face at him; that she told her sister that she had not
paid her taxes, when in fact she had paid them; that, on occasion
of visiting her sister at Mt. Pleasant, she told her sister that she
(the sister) "had made changes in her house," when in fact
she had made no changes whatever; that she took a child of her
son's to keep and look after, and at the same time was running a
boarding house, and said she couldn't take care of the child; and
yet that she had her son send another child to her, and she
looked after and cared for the two children at that time, when
she frequently would complain that she could not take care of
them; and yet that she would continue to do so, and when her
son visited her, she would say nothing about his taking them away
until after he left, then would complain that he had no right to
leave them there, and that he ought not to do it; that she com-
plained to the family that the death of her daughter, some two
years before, was due to the medicine which the doctor gave her,
and that, if she had taken care of her herself, the daughter
would have lived; that she frequently spoke of having lots of
money, and said that in three years she would be a millionaire,—
that she was making bushels of money. Further included in the
question were the assumed facts that Mrs. Armpriest had con-

tinually said she would not sell the property in controversy for less than $3,000, and that, when the opportunity was presented to her, she sold it for $2,200, and said in justification that the purchasers told her that, if she did not sell it, they would have it appraised, and she would have to sell it. Only the daughter (appellant) testified to these matters. We are constrained to doubt the reliability of appellant's testimony, in some particulars at least. Appellant was at the bank with her mother when the contract was signed, and afterwards said as a witness that she (her mother) had several arguments before the contract was signed, with Mr. Toothacre, cashier of the bank; that she got pretty well excited; that she put her hands over the middle of the table and pounded her fist, to make them understand; that her mother was so excited in the argument about the taxes that she just pounded on the table with her fists.

There were five or six men present,—one of them Toothacre, cashier of the bank, and the others, farmers and business men,—and they all testified that there was no excitement on the part of Mrs. Armpriest; that she did not become excited or pound the table with her fist, nor was there anything unusual in her conduct.

Appellant went with her mother and saw her sign the contract and receive the $500 payment, and raised no objection,—never suggested to the gentlemen present that there was anything wrong with her mother; and then came upon the witness stand and testified in her examination in chief that, at the time her mother signed the contract, she (the witness) knew that her mother was insane. On cross-examination, she said:

"If I said she [her mother] was insane, I did not mean to say she was insane on that day. I know she is insane now, and I knew afterwards that all these little things led up to her insanity. I knew she was extremely nervous. I did not know she was insane at that time. I didn't tell these men she was insane. I didn't intend to deceive them."

On redirect examination, she testified:

"I didn't realize the condition she was in at the time, but I realized she was extremely nervous, and had been all summer, during the hot weather. Before going down there to sign the contract, I told my mother not to get excited or nervous,—just to

keep her mind on the business, and not to think of anything, only what she was doing.''

The daughter's memory was a little faulty, at least. It appears without controversy that she and her mother called at the office of Mr. Power about September 2d, at the time the purchase price was to be paid, for the purpose of receiving the balance due, and delivering the deed. Concerning that transaction, this witness testified:

''We were at Mr. Power's office one time, and you [Mr. Power] called Mr. Cowles over. Someone told us to be at your office. I don't remember what we were there for.''

All of the appellees testified that they did not say to Mrs. Armpriest that, if she did not sell to them, they would have the property appraised and take it way from her. If Mrs. Armpriest made such statements to her daughter, it probably did not flow from a delusion, but more probably from an erroneous understanding that the property could be condemned for the use that appellees were going to make of it. It is strange that appellant did not remember what she and her mother and their attorney were at Mr. Power's office for. Unquestionably, they were there to carry out the contract. They were there to receive the balance of the purchase money and to deliver the deed. Mrs. Armpriest wanted the balance of the purchase money, so that she could use it to make payment on the property she had purchased from Magel. Appellees refused to pay over the money to Mrs. Armpriest, because they wanted the incumbrance on the property paid off, and the taxes paid, before they paid the balance of the purchase price. Appellees told her, or told her attorney in her presence, that they would leave the money with the Farmers & Merchants Bank, and that, as soon as she delivered to them merchantable title, Mr. Toothacre, who was cashier of the bank, would turn the money over; and the money was left in the bank. No objection whatever was made by Mrs. Armpriest or by her attorney or by her daughter, to the carrying out of the contract.

Dr. McKitterick, who had been the doctor member of the commissioners of insanity for ten or twelve years, and who was acting in that capacity when they examined Mrs. Armpriest, in November, 1919, testified that the nature of her difficulty pointed towards paresis, or softening of the brain; that paresis comes on

gradually, and that there are certain times when there is quite an excitability,—acutely so; that it was very acute, the day he examined her in November, 1919; that apparently she had been in a normal stage until perhaps a few weeks prior to his examination; that he thought the stage she was in then was apparently recent; that, in his judgment, the period of excitement was of short duration; that paresis is a progressive disease. He testified:

"I would not say that a paretic was insane previous to the time it manifested itself in excitement and extreme nervousness. We have had paretics who conducted battles in the navy that have settled questions of international import. I have had paretics under my own observation that have bought and sold large stocks of goods,—not necessarily extraordinary cases, because paresis is of slow origin. It is my conclusion that this maniacal stage was recent. When it had not reached such a stage that there were outward manifestations, there would be no way for unskilled men to determine whether she was afflicted or not."

The adjudication finding Mrs. Armpriest a person of unsound mind was not until the 13th day of October, 1919, between two and three months after the date of the contract involved in this action. The evidence shows, beyond controversy, that, during that interval, Mrs. Armpriest had been transacting business as she ordinarily did, carrying on her boarding establishment, buying real estate, and transacting business with the banks. In short, the record does not show a single act or fact upon the part of Mrs. Armpriest, until some time after making the contract, indicating incapability to make such a contract. No doubt disease—probably paresis—had been preying upon her for some time before she broke down, in October. She had carried on her business just as she had done for years before. Just before her breakdown, she had added to her burdens,—papering, painting, and cleaning another house, preparatory to moving out of the house she had sold. La Monte Cowles, a prominent lawyer and responsible man, who for a number of years had been Mrs. Armpriest's attorney, and who assisted her in making the contract and purchase of the Magel property, on August 26, 1919, 22 days after the contract here involved was made, testified:

"At the time the contract with Magel was made, there was no thought on Mr. Magel's part, or on my part, or that of anyone else, that Mrs. Armpriest was insane."

Mr. Cowles could properly only state his own opinion of Mrs. Armpriest's condition of mind. However, we think his opinion sound:

On the whole record, we are constrained to find that it has not been shown that Susan Armpriest was incapable of transacting the particular business in question, the making of the contract involved in this cause. We think the delusions relied upon, those which were sustained by the evidence, did not influence Mrs. Armpriest to such an extent, if at all, that she was without reasonable conception or understanding of the true nature and terms of the contract. *Mathews v. Nash*, 151 Iowa 125, 127. Mrs. Armpriest was only 52 years old. Cooking for boarders and keeping and caring for two young grandchildren, with disease creeping on her, had, on August 4th, impaired her physically; and probably, to some extent, she was then impaired mentally. But mere proof of mental defect does not necessarily establish incompetency. *Evers v. Webb,* 186 Iowa 1172; *Mitchell v. Mutch,* 180 Iowa 1281. In the last named case, we said:

"Mere weak-mindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance."

Since we reach the conclusion that it has not been shown that appellant's ward was incapable of making the contract involved in this case, it is not necessary that we proceed further in the discussion of the case. However, we may 2. VENDOR AND PURCHASER: rescission: ineffectual attempt to restore *status quo.* consider whether or not appellees would be placed *in statu quo* by appellant's returning to them the $500 received on the contract, which she offered to do. It is an elementary rule that placing *in statu quo* implies restoration of the party injured to as near the condition that existed prior to the making of the contract as possible. The evidence shows that appellees' agreement to purchase

any of the several pieces of property was conditioned upon acquiring all of it, and that appellant's ward was distinctly notified of that fact. After obtaining options for the purchase of the several pieces of property, they informed appellant's ward that contracts had been agreed upon with the owners of the pieces of property other than hers, and that they would buy her property. The contracts were all made on the same day. Mrs. Armpriest's property was of such a character and so located, and its relation to the other pieces of property such that, if appellees were not able to acquire title to all of the pieces of property, it would practically defeat the purpose for which they were buying; and they would not have purchased any of it, had they not been able to make a contract with appellant's ward. They purchased real estate for which they had no use unless they acquired Mrs. Armpriest's property. The other real estate had improvements on it which were sold at auction and removed, and they received only a small consideration for the improvements. Ordinarily, in a case of this kind, the returning of the cash payment would place the injured party in the condition that existed prior to the making of the contract. Not so in the instant case. It would not compensate them for their inability to carry out their enterprise, in which they invested a large amount of money.

On the entire record, we are satisfied that the decree of the trial court is correct, and it is, therefore,—*Affirmed.*

EVANS, C. J., STEVENS and FAVILLE, JJ., concur.