G. D. DAVIDSON, Guardian of ANNA DAVIDSON, Incompetent, Appellee, v. JOE L. PIPER et al., Appellants.

No. 43360.

FEBRUARY 13, 1936.

J. W. Kridelbaugh and J. D. Threlkeld, for appellants.

G. C. Stuart and A. V. Hass, for appellee.

PARSONS, J.—The plaintiff in this case is the guardian of Anna L. Davidson, who was adjudged insane by the insanity commission of Lucas county, Iowa, on December 29, 1933, and she was committed to the State Asylum at Mt. Pleasant, and has ever since been there confined. As such guardian he began this suit to recover of the defendants the sum of $25,535, claiming that defendants had procured from his ward since April 1, 1933, certain moneys, bonds, and properties belonging to his ward, and that during all this time she was incompetent and completely unable because of her unsound mind to transact business affairs generally, or to deal in any particular manner in business with defendants, or either of them, or any other individual; and also alleging that each of the defendants had knowledge of these facts, or were presumed to know of such insanity. It was further alleged that Anna L. Davidson received nothing in exchange for her property, except receipts, which are valueless; and alleged that this property was procured by the defendants by imposition and concealment of material facts, and at times when they knew, or should have known, or were presumed to know, because of their knowledge of certain facts, that the said Anna L. Davidson was insane and unable to transact any business whatever; and that the defendants had obtained the property under circumstances which rendered their holding in their own right inequitable, and that the plaintiff is equitably entitled to the same as the guardian of the incompetent; and that the defendants held same as trustees for the benefit of plaintiff's ward. The prayer asked for specific and general relief.

The defendants each filed answer denying generally all the matters and things set up in plaintiff's petition; and on his part the defendant Joe L. Piper, hereinafter called Piper, filed a counterclaim in which he charged that the plaintiff's ward had been in his employ for a number of years, and that

during that time she had misappropriated large sums of money, and asked for an accounting of it, and it was set up in each answer that the property taken by defendants was in settlement of the obligations of the plaintiff's ward to the defendant Piper.

We gather from the pleadings that on June 4, 1933, Piper received personally from the plaintiff's ward the sum of $9,586, which she stated to him had been wrongfully taken from him, and which she desired to restore. It also appears that subsequently the defendant W. H. Piper received certain bonds of the ward aggregating $11,650, and a $1,000 note, and at another time he received $2,282 in cash, which bonds and cash were delivered to his father, his codefendant, Joe L. Piper, and that W. H. Piper was to obtain a receipt from Joe L. Piper to Anna L. Davidson, reciting that it was all the money she owed him, and that a receipt was so issued.

Joe L. Piper owned different stores, the principal one at Chariton. Anna L. Davidson commenced working for him as a bookkeeper in 1913, and continued in that employment until 1918, and she was again employed in 1924 and continued in his employ until in September, 1931, being a period of about 12 years.

To his original petition in this case the plaintiff filed certain interrogatories to be answered by the defendants. These were answered by Joe L. Piper, as set forth, that on June 4, 1933, Anna L. Davidson delivered to him $9,586 in cash, and she stated to him at the time of delivery that it was money which belonged to him and which she had taken from him during the time she had been in his employment, and he said he used the money to pay obligations incurred by reason of the appropriations of Anna L. Davidson. His answer further set forth the receipt of $2,282 from W. H. Piper on the 24th of December, 1933, and the delivery of bonds of the face value of $11,650 on November 27, 1933, which bonds were listed by their proper description, also a note for $1,000 principal, signed by himself. In other words, he received from W. H. Piper $2,282 in cash, paper of the face value of $11,650, and a note for $1,000, and on June 4, 1933, he had received personally $9,586, making a total of $24,518. The theory claimed was that all this property was received by J. L. Piper from the plaintiff's ward as an adjustment or settlement of the amount of the claimed wrongful

appropriation of Piper's money by plaintiff's ward, as a settlement of an accounting between them.

■■■ In considering the effect of the testimony and the facts, it is evident that a differentiation will have to be made between the $9,586 payment on June 4, 1933, and the subsequent payments, made at a time much closer to the adjudication of insanity against plaintiff's ward. It would be much more difficult to hold that the payment of June 4, 1933, was made under circumstances which would charge defendants with knowledge and notice of the insanity of Anna L. Davidson than to hold that her condition was such at the time of the later payments that they were charged with notice and knowledge of her insane condition. And in arriving at a conclusion on these facts, and as to what the rights of the parties were, a court might easily arrive at one conclusion in regard to the June 4th payment, and another conclusion in regard to the subsequent payments for taking over the property. The moment that Anna L. Davidson was found insane, and was adjudged by the insanity commission, then there would be no question that he would deal with her on that basis. And, had the adjudication been prior to any of the transactions complained of, it would be much easier to find that restoration must be made by the defendants than to so find where the transactions took place prior to the adjudication.

■■■ There is a presumption that all human beings are sane until the contrary appears. That being once established, there is ordinarily a presumption that it continues from the date of the establishment, but this presumption does not run backward. It is prospective and not retrospective. So in this case the burden of proof is necessarily upon the plaintiff to show such state of facts, in order to recover, that the court will find under the testimony that at the time of each particular transaction involved Anna was insane, or such a set of conditions existed as compel an accounting by the defendants. So it will be necessary to consider and inquire into the evidence in the case, and particularly the evidence as to the sanity or insanity of Anna L. Davidson for all the time involved in this litigation.

The evidence shows that the particular kind of dementia Anna L. Davidson has is dementia praecox, paranoid variety. It is accompanied by hallucinations, which are false perceptions.

Delusions are conclusions or ideas held by an individual which are false. The false perceptions are matters that take place from time to time or moment to moment, as seeing an object or hearing a sound, which may be repeated. A false delusion particularly in this type of insanity is a false belief based on the result of defective judgment which tends to be fairly persistent. The basis of that delusion, the hallucination, may have been connected with faulty judgment. Such is the definition given in the testimony of Dr. Mangum, one of the staff of the asylum at Mt. Pleasant. It is evident from the reading of the testimony that, if Anna had these hallucinations and delusions at the time she was committed to the asylum, that is, found insane by the commission, they must have existed for some time previous to the turning over of any of the property or money to the Pipers other than the first money turned over, the $9,586 paid directly to Joe L. Piper by Anna on or about the 4th of June, 1933, almost 7 months prior to the date of the adjudication of insanity. But the evidence shows without particular dispute that, prior to the turning over of the bonds and money, which was received by W. H. Piper and subsequently turned over by him to his father, Anna was so afflicted with delusions and hallucinations that she thought the Pipers had control of some machine that was in some way working on her; that she could hear their voices through that machine; that it was trying to annihilate her, kill her, burn her up in the furnace, and this had existed at least for some time prior to the transactions in which W. H. Piper figured. In other words, during that time and while she held these delusions and had these hallucinations, she was insane, she was incapable of transacting business intelligently, and therefore, as to these items being all the items in dispute here, other than the $9,586, the defendants should be held to account to the plaintiff herein as guardian of Anna L. Davidson. Unless the defendant Joe L. Piper has established by a preponderance of testimony that Anna had in fact embezzled, taken, or stolen from him an amount of money greater than the $9,586, then he would not be entitled to recover from her property held by her guardian the amount of such excess. In other words, being in this state of mind, Anna L. Davidson was in fact at the time she turned the money and bonds over to W. H. Piper incapable of transacting business, and, unless W. H. Piper, who was acting as agent for his

father, is to be protected by reason of the indebtedness of Anna to his father, if any existed, he equally with his father would be liable to a judgment; that the amounts turned over to him and by him to his father should be held in trust for or accounted for to the plaintiff herein as the guardian of Anna L. Davidson, And the burden of proof would be upon the defendants in this case to show as to the matters under discussion here that they were not required to account, and were required to establish the defalcation of Anna sufficient to cover the amount so received. We think that the following cases in this court support these conclusions: 32 Corpus Juris, Insane Persons, sections 508–510; Warfield v. Warfield, 76 Iowa 633, 41 N. W. 383; Galt v. Provan, 108 Iowa 561, 79 N. W. 357; Swartwood v. Chance, 131 Iowa 714, 109 N. W. 297; Searles v. Northwestern Mut. Life Ins. Co., 148 Iowa 65, 126 N. W. 801, 29 L. R. A. (N. S.) 405; Nutter v. Des Moines Life Ins. Co., 156 Iowa 539, 136 N. W. 891; and Hult v. Home Life Ins. Co., 213 Iowa 890, 240 N. W. 218. In all these cases numerous supporting authorities were cited.

We do not see how the lower court could arrive at any other conclusion in this case, as to the items under discussion here, than that the plaintiff's ward was at the time of the transfers or delivery of the property to W. H. Piper insane, and in no position or situation or condition to contract or transact business of the character involved; and that at the time she was suffering under an insane delusion and hallucination so as to completely unbalance her mind in regard to such business transactions.

However, as to the item of $9,586, the evidence shows its receipt by Joe L. Piper on the 4th of June, 1933, and that he took the money because it was voluntarily given to him by Anna in repayment to him of an amount that she claimed when she gave it to him she had taken from him during the period of her employment by him. Of course, if she did make these statements or confession, or turned the money over on that theory, and he accepted it upon that theory, believing it to be true, plaintiff in this case as the guardian would not be bound by any admission or statements of settlement or adjustment she made with Joe L. Piper by which he received this amount of money, if she at that time was in fact insane and incapable of transacting business. And in considering this subject it

must be borne in mind that the burden of proof is upon the plaintiff in this case to show that at the time of the turning over of the sum here in discussion Anna L. Davidson was incapable of transacting business by reason of being insane at that time.

This calls for an examination of the testimony as to when the claimed insanity began, and as to when her condition first existed in such state or form as to preclude her from doing business done at that time. The record in this case is quite lengthy, there being 311 pages of the original abstract, an amendment thereto of 67 pages, and another short abstract, more than 380 pages of abstract. We have carefully gone over these abstracts and in reference to the questions herein discussed and the delivery of $9,586 to Joe L. Piper on June 4, 1933. This delivery was 6 months and 25 days before the adjudication of insanity. It is true that Anna L. Davidson did some peculiar things, had some peculiar ideas in her head, before that time. Her brother, the guardian, was visiting Anna in Des Moines when she was living in a duplex house she had built. He arrived there in the evening, after dark, Anna unlocked the door and let him in. While he was there, she talked of persons in the next apartment talking about kidnapping her for her money; her brother listened, and then talked in a loud voice to let the occupants of the other apartment know there was a man with Anna, and he himself says he thought Anna was the party they were after. True, she was an inmate of a hospital in Des Moines some several years before, and was an inmate of a hospital at Chariton for a short while, and made a visit to Rochester, and during those times she was nervous, apprehensive, scared of things, and all of that. But she came back to Chariton and lived most of the time with Mrs. Shepard, an old lady 77 years of age. She seemed to transact her business without any trouble. The evidence shows several traveling men testified as to doing business at the Piper store, that she carried on her business with them in a businesslike way; none of them noticed anything out of the way with Anna. Witness after witness so testified. But the evidence appears that a short time prior to the adjudication of insanity on December 29, 1933, the Wednesday or Thursday before Christmas, which that year was on Monday—four or five days before Christmas, and nine or ten days before the adjudication of insanity—Anna began to

talk, and did talk, about the Pipers, being obsessed with the idea that the Pipers had a machine they were using on her, that it was clamped about her head, that she would be burned up by it, or put in the furnace, unless she finally settled up with the Pipers. It also appears that around about that time she stated that, while she was working for the Pipers, she was dissatisfied with the wages he paid her; that he would not get her a typewriter she wanted; that she thought she should have more money; and that she took money from him, and "plenty of it". Otherwise she appeared to be all right, and up to this time nothing of the delusions or hallucinations had been manifested, or that may be said to show they existed. Up to the time of the statement by her that the Piper machine was working on her, as she claimed it was, there had been nothing to show, except some erratic behavior, that she was not able to conduct her business all right; that while she worked for the Pipers no one questioned her behavior. Person after person testified to acquaintance with her, and noticed nothing unusual in her behavior or actions, and the record is entirely devoid of any evidence that would justify the court in finding that her incapacity, by reason of insanity, to transact business, existed at any time prior to November, 1933.

 We have not set out the whole record, but have given the substance of it; we have given our conclusions on the reading of the evidence and study of the record. We, of course, do not refer to the testimony of one of the physicians in the Mt. Pleasant Hospital, where Anna was confined beginning December 29, 1933, and still is confined. This physician was one Dr. Mangum. This witness was employed at the Mt. Pleasant State Hospital for the Insane; he had practiced medicine about nineteen years; had graduated from the State University of Iowa, and took post graduate work there and in the University of Chicago. He said his present work was limited to mental disorders, and that he had been specializing on the same between two and one-half to three years; that he did all the mental analysis of the men, and occasionally did an examination on the female side; that sometimes when questions arose the patients were brought before the staff. He said he examined Anna and she was under observation of himself and Dr. Beach. He defined hallucinations as false perceptions, that may affect any of the senses—feeling, hearing, smelling, and tasting; and said

this patient was hearing imaginary voices all of the time. He then said her examination indicated that, when she heard voices, she did not know whose voices they were, but later identified them as voices of Piper and of the Piper family. Incidentally, this last statement involves what? That the doctor talked with Anna and from *Anna* learned those things. He speaks of her having hallucinations of persecution; of gas being put in her room through holes in the ceiling, and that a ladder was put up to her window; that she heard voices up stairs of somebody going to kidnap her; that she believed Piper had a persecuting machine in his home that would control her, would not let her eat or sleep; that they were able to talk to her through the machine; she believed the machine to be a lie detector; that it was something like a radio with which they were able to torture her; and she stated she had paid the money over to Piper and had a receipt in full, and yet the torture continued; that she was not fairly treated while an employee of Piper's; and that he was keeping her in the state hospital for punishment. Of course, this record must all have been gathered from his conversation with, and observation of, Anna. He went on to say that many questions were asked concerning the handling of money, and her answers were vague and evasive; that he was unable to get a definite answer from her; that she had an idea that during her second period of employment with Piper she routinely took money from him, but, when questioned, she did not know how much money she took, or where it was, where she kept it, and did not know how much she paid back, but had a receipt. Dr. Mangum said he was of the opinion her insanity was permanent and progressive, and that she was totally disabled by reason thereof. And in response to this question: "Q. Now, from her condition as you find it to be at this time, and your examination of her after her admission in December, 1933, between that time and this time, are you able to give us an idea, doctor, any definite idea, of about how long she has been suffering from this insanity?" Dr. Mangum answered: "The opinion we have on that is based on two things: First, upon the examination of the patient herself, and, second, upon the corroborative material which has been placed in the file—information furnished by relatives," etc. He said as a conclusion: "According to the information obtained directly from the patient it is our opinion that the first experience she had

with an hallucination was four years ago, shortly after her operation in Des Moines," and further said: "But an analysis of the case would indicate that Anna Davidson from a relatively early age has had a rather marked personality defect in that she was of a seclusive temperament and did not show the usual interest in the opposite sex which would be expected." The doctor further said: "I do not think she is competent to transact business matters of importance at this time." He said he discovered about the machine in September, 1934. Of course, all he had was hearsay at that time—all the statements of Anna herself. Asked how he was able to get an opinion that in June, 1933, she was unable to conduct her own business intelligently and understandingly, he said he gathered that from the several answers she has made since her hospitalization; and then he said she would be incompetent to do business in June prior to commitment in December, 1933. On cross-examination he testified that he gained information about her by questionnaires submitted to her relatives; he said she was insane at the time he made the examination, and he asked her questions there about her past life and she told him; that some questions she would answer and some she would not; that he based his conclusions on the questions answered and those not answered; and that he never saw Anna before she came to the hospital. He was then asked this question:

"Q. Doctor, what I want to know is this, and I think you can answer the question: If Anna Davidson conducted her own business intelligently and understandingly for four years prior to the time she came to the hospital, would you say then that this condition had existed for four years and during all that four year period?" He answered: "That is next to impossible to answer because it is so much at variance with our information."

"Q. The information of an insane person? A. Yes."

He was then asked: "Now, assume she had conducted this business understandingly and intelligently for the whole four year period before she came there, would your examination as made of her still compel you to reach the same conclusion that she had been suffering from this disease for four years? A. Yes I think it would. It has lasted longer than that."

He was then asked: "Then as a matter of fact, doctor,

we must arrive at this conclusion, she could have had this disease assuming she did conduct her business intelligently—and still have this disease, is that not true? A. That is very hard for me to answer because you are assuming things that are contrary to our findings in this case.''

''Q. Now assuming she did conduct her business intelligently and the business of other people intelligently during all this four year period, then your conclusion must be that even with this disease she could conduct her own business? A. It seems to me counsel assumes in one part of the question that the patient is sane and in another part that she is insane.''

And he further said: ''I don't think the question is possible to answer.'' He said he thought she might conduct her business, but there would not be much intelligence; that there might be a routine habit formed which she would follow, but he did not think there would be much intelligence. He testified he practically relied on the statements she made to him, at least some of them. He said the operation she had had a very minor part in her condition of mind. On cross-examination he told about the inquiries to relatives, and amongst them was the plaintiff, brother of Anna. The doctor was asked, ''If a person had stolen a large amount of money and feared they were going to be detected, or were conscience stricken about the matter, might cause this particular form of disease, might it? A. Probably not in itself but together with other factors it might be the precipitating cause.''

We think that this testimony of the doctor is not sufficient foundation, even taken with the other testimony in the case, for saying that this woman was insane for any particular length of time before she was so adjudged. A reading of the testimony shows he took into account many things which would not be considered in court for a moment; interviews with relatives; statements of an insane person as to facts; answers to written inquiries to relatives. We are willing to concede that a physician has some latitude in these things, but we are not willing to concede he can base his opinion as largely as he has done in this case on incompetent testimony and have us accept that as a conclusion in the case against the weight of the evidence of people who saw Anna from June, 1933, on down to the date of the adjudication of insanity, and that therefore there is noth-

ing sufficient in this record to show that Anna Davidson was insane or incapable of making a contract or conducting her business when she turned the $9,586 over to Joe L. Piper, and that therefore Mr. Piper should not be held to account for this.

We think that this testimony of the doctor is not sufficient to show that the insanity of Anna Davidson preceded very long the adjudication of insanity, and certainly is not sufficient to show that the insanity preceded the adjudication about 7 months. Holding this view, and the whole record showing that this money, $9,586, was turned over voluntarily by Anna Davidson to Joe L. Piper, and that it was to replace money she wrongfully took from him, that he had a right to take it, that she knew at that time what she was doing, therefore he cannot be compelled to account for this particular item. Wendt v. Foss, 161 Iowa 122, 140 N. W. 881; Elwood v. O'Brien, 105 Iowa 239, 74 N. W. 740; Rickman v. Houck, 192 Iowa 340, 184 N. W. 657; Kramer v. Leinbaugh, 219 Iowa 604, 259 N. W. 20, and cases therein cited, and Hult v. Home Life Ins. Co., 213 Iowa 890, 240 N. W. 218.

We think there is no presumption which would cover the time between the adjudication and the 4th of June, 1933, nearly seven months before, that would warrant the court in finding that Anna at the time of turning over the $9,586 was in such state of mind that she did not know or realize what she was doing.

The defendant Joe L. Piper filed a counterclaim or cross-petition in this case; evidence was taken on it; the books were examined; so-called experts went over them. We have carefully examined them and the testimony in regard to these books, and we do not believe that the evidence on that is sufficient to establish that Anna took any more money, if she did take any, than the amount she turned over to Mr. Piper on the 4th of June, 1933. The judge who tried this case filed an opinion, and we agree with a great part of it, and agree with all his conclusions except as to the $9,586 and an item of $2,900, and with that we do not agree. He held, in short, that the defendants were liable for the $9,586 and for the balance of the funds so received, and entered a decree accordingly. However, the court held that there could be no recovery of $2,900 of United States government bonds which were received by W. H. Piper and turned over to his father in November. However, on the whole, we think that the plaintiff should have had judgment

for all of the personal property taken, including the $2,900 of bonds which had been disposed of by W. H. Piper, and that it should have been held that all the other property taken was a trust. We think the decision of the lower court was not correct as to $9,586, and as to the liability of defendants for the $2,900 of government bonds above mentioned, that the plaintiff should be given a judgment in addition to the amount given, in the sum of $2,900 with interest at 4 per cent, as we will presume the government bonds were of face value; and that a new decree should be entered in accordance with these findings, fixing the recovery upon the basis of the findings herein; and that either party may have decree entered in this court instead of in the district court; and that the costs of the case be divided equally between the plaintiff and defendants.—Modified and affirmed.

DONEGAN, C. J., and ALBERT, POWERS, KINTZINGER, and RICHARDS, JJ., concur.