E. M. MITCHELL, Appellee, v. JAMES MUTCH et al., Appellants.

SPECIFIC PERFORMANCE: Contracts Enforceable—Weakness of
1 Mind—Inadequate Consideration. Mere weakness of mind, unaccompanied by inequitable incidents, is insufficient to defeat the enforcement of an executory contract of sale, when such person has sufficient intelligence to understand the nature of the transaction and is left to act on his own free will. *Held,* contract enforceable, though the one objecting was quite aged, was very eccentric, was, to some extent, afflicted with senile dementia and arteriosclerosis, though the payments were long extended, and though the land was under-sold in some small degree.

SPECIFIC PERFORMANCE: Proceedings and Relief—Non-Discre-
2 tion to Deny Relief. A definite, written contract for the sale of lands, on a valuable and adequate consideration, free from fraud, and which may be enforced without hardship on either party, leaves a court of equity with *no* discretion to deny specific performance.

WITNESSES: Competency — Attorney and Client — Confidential
3 Communications. Principle recognized that communications by a client to his attorney are not privileged unless they are *confidential.*

APPEAL AND ERROR: Presumption—Equity Causes—Disregarding
4 Incompetent Evidence. On appeal in an equity cause, it must be presumed that the trial court disregarded all incompetent testimony.

SPECIFIC PERFORMANCE: Defenses—Defects in Title—Waiver
5 by Plaintiff—Effect. One may not defeat specific performance by pleading in defense that which plaintiff waives. So held where defendant pleaded that he had rented the land and could not deliver free possession as agreed.

*Appeal from Tama District Court.—J. W. WILLETT, Judge.*

THURSDAY, SEPTEMBER 24, 1917.

SUIT for specific performance of a contract to sell real estate. Decree for plaintiff. Defendants appeal.—*Affirmed.*

*E. H. Lundy, Dean W. Peisen,* and *Williamson & Willoughby,* for appellants.

*Sherman W. DeWolf, Thomas & Thomas,* and *Clarence Nichols,* for appellee.

STEVENS, J.—I. James and Mary Mutch,

1. SPECIFIC PER-
FORMANCE: con-
tracts enforce-
able: weakness
of mind: inad-
equate consid-
eration.

husband and wife, on April 28, 1913, made a written contract with E. M. Mitchell, in consideration of $57,600, to be paid, $600 in cash, $5,000 March 1, 1914, the balance in 10 years at 5 per cent interest, to sell and convey to him the south half of Section 3, Township 86, Range 15, Tama County, Iowa. The contract, as originally written, did not require the purchaser to secure the payment of the $52,000, but, on June 11th following, a stipulation was written on the contract, signed by the purchaser, and by the grantors by their attorney, by which the same was to be secured by mortgage on the premises. Upon the refusal of the grantors to carry out the deal, on April 17, 1914, the petition of plaintiff praying for specific performance of the terms of the contract was filed in the office of the clerk of the district court of Tama County. In the meantime, Elizabeth Mutch had been appointed temporary guardian of James Mutch.

The defenses urged upon behalf of defendants were, in substance: (a) That the consideration to be paid for said premises was inadequate; (b) that James Mutch was at the time a person of unsound mind, and that he and his wife are greatly distressed over the sale of said premises

and the possibility of being compelled to turn the same over to others; (c) that appellee and others conspired together to procure the conveyance of said real estate, by representing to James and Mary Mutch that the land at $200 per acre was too high, and that same was not worth that sum; and that by their conduct and representations they overreached the old gentleman and caused him to execute the contract in question.

It appears from the evidence that James Mutch was born in Scotland, went to Tama County many years ago, and has accumulated a fortune of about $250,000, owns 760 acres of land in the vicinity of the above described premises, including the land in controversy, and has been an active, hard-working, successful farmer. His family consists of three daughters and three sons, all of whom were, at the time of the transaction in question, absent from his home, except Elizabeth, who is unmarried.

The land in question is apparently well located, in a good state of cultivation, and well tiled and drained. The improvements thereon, however, are run down to some extent, and the residence is small, old and in bad condition. Witnesses testify that the farm has not been as well kept up and cared for recently as in former years.

Numerous witnesses, including two physicians, testified regarding the mental condition of James Mutch. From the testimony of the physicians, it may be inferred that he has for some time been to some extent afflicted with senile dementia and arteriosclerosis, and that his general physical condition was not good. One of the physicians testified to having waited upon him during a period of illness. They both express the opinion that he was not competent to form an intelligent opinion and rationally transact business of an important character.

He was, at the time of the execution of the contract, 82 years of age, and during the period of his residence in

Tama County had been known for certain eccentricities and peculiarities of person and habit. It is claimed that these have become more noticeable during the last few years. Various witnesses testified that at times he would, while on the streets in town, sing. This, however, he had done always. Further evidence shows that he declared his family was against him, that he was a poor man, and that he intended to go away; that, on several occasions, he did go a short distance, sometimes remaining over night; that, on one occasion, he purchased a railway ticket to Chicago, saying he was going to Scotland, and that at the time he was not seasonably clothed, had no baggage with him, and was untidy, but he was persuaded not to go; that the marshal of Reinbeck found him late at night lying in the doorway of a business house, sleeping; that he was several times found lying on the ground sleeping, on his premises; that on one occasion he covered himself up with hay in the barn, and was with great difficulty induced to return to the house; that friends in an automobile overtook him on one occasion when he had started away, and returned him to town; that he had land in Canada and said he was going there; that he, in later years, became fretful and fault-finding, and appeared to be obsessed with the idea that his family was against him; and there were several instances of like character, indicating that he had grown more untidy, forgetful and eccentric than in former years.

The evidence of claimed improvident dealing upon his part consists of the sale of a horse for $100, claimed to have been worth $150 to $160, and of the sale of a few bushels of timothy seed for $1 per bushel which was worth $5 per bushel, and the sale of the land in question for $180 per acre upon a payment of $5,600, with 10 years' time on deferred payments at 5 per cent interest. As is usual in cases of this character, there was considerable diversity of opinion among witnesses as to the fair market value of the

land, those called on behalf of plaintiff placing same at from $175 to $180, whereas defendant's witnesses placed the same at from $200 to $215, cash.

The evidence regarding the transaction culminating in the execution of the contract, the indorsement thereon of June 11th, and the deed, as the same appears in the record, is, in substance, as follows: In 1911, defendant listed the land with E. E. Taylor, a newspaper and real estate man of Traer, for sale, and same was advertised for sale in circular form and in the Traer Clipper; that an offer of $175 per acre was made for the land and refused by Mr. Mutch; that an offer was made, about the time the contract was consummated, to buy the land for $175 per acre, but defendant clung tenaciously to his price of $180 per acre; that, on the day of the sale, one of the parties whose conduct is complained of went in the forenoon and saw defendant in an effort to purchase the land at $175. This he was unable to do, and, in the afternoon, the several parties, knowing that Mr. Mutch was going or had gone to Reinbeck, went to said place in an automobile and arrived there in advance of Mr. Mutch. He and some of the parties went to the bank; appellee was called in; the deal was talked over; the contract and deed were executed, and arrangements made by which some of the parties went with James Mutch to his home, where Mary Mutch, his wife, signed the deed; and the same was returned to the bank, where it was kept with the contract.

The record fails to disclose any fraudulent representations or conduct on the part of anyone at the bank. The contract was written by one of the officers, and there appears to have been but little conversation between the several persons present. The terms upon which the land was listed with the agent for sale included a cash payment of $10,000, but appellee at the time stated that, before he moved upon the farm, he would have to build a modern

house, which would cost him about $5,000, and he would pay $5,600 cash, which would, in a way, be equivalent to paying $10,000. The terms finally agreed upon were, as stated before, $600 cash, $5,000 March 1, 1914, at which time possession was to be given to appellee, and the balance in 10 years, with interest at 5 per cent, with certain optional payments. Some time afterwards, Elizabeth discovered that the contract did not require the purchaser to secure the payment of the $52,000, whereupon she and her father consulted a lawyer at Toledo, who took the matter up with the purchaser, as the result of which a stipulation was written on the back of the contract and signed by the purchaser and by the attorney for the grantors, by which the purchaser agreed to execute a mortgage upon the premises to secure the deferred payment. The attorney who investigated the matter was called as a witness, and testified that he called his clients' attention to the stipulation, and that they were satisfied therewith, and that he, at their direction, returned the contract to the bank where it was originally left.

The circumstances relied upon by appellant as offering evidence of conspiracy and fraud are that the parties charged with bad faith watched Mr. Mutch pass Taylor's to town, and themselves took a different road to avoid passing him; that they met him upon his arrival at Reinbeck; took him to the bank and procured the execution of the papers; hurried him home to get the signature of his wife to the deed and the matter all closed up before knowledge thereof should be brought to the attention of other members of the family. The parties present at the time of the signing of the deed by Mrs. Mutch testified that Elizabeth was there and procured writing material for the use of the parties in executing the instrument—this, however, she denies and says she was not in the room and did not know what was going on; that there was no attempt at concealment; and that they went to the Mutch residence upon his suggestion

that his wife could not conveniently come to town; and that it was convenient at that time to consummate the execution of the papers. The explanation made by the parties of the route taken by them to Reinbeck was that one of them had told Mr. Mutch that he was not going to town, and that he did not want to pass him on the way.

While we have not mentioned all of the testimony tending to throw light on the mental competency of James Mutch, we have referred to the more important portions thereof, and from the entire record we are of the opinion that, while he was doubtless enfeebled by age and to some extent deprived of the mental vigor and business sagacity of former years, yet he had not so far deteriorated mentally as to be unable to comprehend and understand the transaction in question, and to reach a reasonable conclusion as to what he desired to do in the way of selling his land. The improvements on the farm were apparently deteriorating in value, his eyesight was bad, on account of his age it was inconvenient for him to manage his business affairs, his sons were all absent from home and he was compelled to rely upon hired help or tenants to farm his land, and his conclusion to sell a part thereof would not tend to indicate lack of proper mental capacity. The time allowed for the payment of the $52,000 was, at his age, pretty long, but it was claimed that he stated, at the time of the execution of the contract, that he did not need the money, and that the interest income would yield him more than $6 per acre rental for the land, and that he had ample money for his needs. It appears from the testimony that he, at the time, had $15,000 in the bank where the papers were drawn, on which he was receiving 4 per cent interest. He may have been inspired with the belief that his family was against him, and with a desire to go away, but his desire does not seem to have controlled his judgment to the extent of inducing him to sell the land at even $5 an acre less than the

price which he had constantly demanded therefor. That he was forgetful, that his eccentricities appeared more pronounced, that he was not so attentive to the affairs of the farm as in former years, nor so good a judge of stock, etc., is not unusual in men of his age and temperament, but these things do not necessarily indicate such loss of the mental faculties as to render him, within the meaning of the law, of such unsoundness of mind as to require the setting aside or cancellation of his contracts.

The land had been on the market for many months without a buyer. Counsel for appellants explain this, however, by saying that no one in the community believed that he would sell his land when put to the test. That this belief was prevalent in the community appears from the evidence to be true, and it may have influenced those who might otherwise have purchased the land to refrain from attempting to do so.

But there is, in our opinion, no such inadequacy of consideration as to shock the conscience or justify the inference that James Mutch was overreached in the transaction. The judgment of men as to values of property differ so radically that expressions of opinion as to such matters are not usually very conclusive, but of necessity constitute evidence that must be given careful consideration by the court. Making some allowance for the possible tendency to under- and over-value the land, under the circumstances, and placing the value of the land at some reasonable figure between the values fixed by the witnesses in behalf of the respective litigants, we think the land may have been worth a few dollars an acre more than the price paid, but the difference is not sufficient to justify the court in finding the consideration so grossly inadequate as to require the interference of a court of equity. The inference is not unreasonable that, after the indorsement had been placed on the back of the contract, requiring the purchaser to secure the payment of

the $52,000, the parties were satisfied, and then approved the deal, and that they intended to comply with its terms. The time that had elapsed between the date of its execution and the addition thereto had been sufficient for reflection and an understanding of the real nature of the transaction, and whether provident or otherwise. It may be that sentimental considerations have tended to change the minds of the parties, and that they have become reluctant to part with so large a part of their farm and to turn the same over to others; but however unfortunate the contract under the circumstances for such reasons, if they exist, it affords no ground for the action of a court of equity.

"*Mere* weakmindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own *free* will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance." Pomeroy's Equity Jurisprudence (3d Ed.), Section 947. See *Crooks v. Smith,* 123 Iowa 439; *Nowlen v. Nowlen,* 122 Iowa 541; *Paulus v. Reed,* 121 Iowa 224; *Harrison v. Otley,* 101 Iowa 652.

The rule in cases of this kind is well settled by the decisions of this court:

"It is well settled by the decisions of this court, as well as by the decisions elsewhere, that, to avoid a contract on the ground of mental incapacity, it must be satisfactorily shown that the party was incapable of transacting the particular business in question. If delusions be relied upon, it must be shown that they influenced the party to such an extent that he had no reasonable conception or understanding of the true nature and terms of the contract." *Mathews v. Nash,* 151 Iowa 125, 127; *Swartwood v. Chance,* 131 Iowa 714; *Reese v. Shutte,* 133 Iowa 681.

II. It is, however, urged by counsel for appellants that whether or not specific performance will be decreed rests largely in the discretion of the court. In a sense this is true, but the discretion to be exercised is not arbitrary, capricious, or unsound, but must be controlled by established principles of equity and exercised upon a consideration of all the circumstances of each particular case.

2. SPECIFIC PERFORMANCE: proceedings and relief: non-disrelief to deny relief.

"Where, however, the contract is in writing, is certain in its terms, is for a valuable consideration, is fair and just in all its provisions, and is capable of being enforced without hardship to either party, it is as much a matter of course for a court of equity to decree its specific performance as for a court of law to award a judgment of damages for its breach. * * * The remedy of specific performance is governed by the same general rules which control the administration of all other equitable remedies. The right to it depends upon elements, conditions, and incidents, which equity regards as essential to the administration of all its peculiar modes of relief. When all these elements, conditions, and incidents exist, the remedial right is perfect in equity." Pomeroy's Equity Jurisprudence (3d Ed.), Section 1404, and cases cited. See *Auter v. Miller*, 18 Iowa 405; *New York Brokerage Co. v. Wharton*, 143 Iowa 61.

Among the circumstances tending most strongly to indicate bad faith upon the part of appellee was the omission from the original contract of any provision for securing the payment of the $52,000. There appears, however, to have been nothing said about the matter by anyone present at the time, and the omission may have been wholly unintentional, and not in any sense attributable to the act of appellee. In any event, the attorney who acted for appellants testified that, upon request, appellee signed the in-

dorsement on the back of the contract requiring him to secure the payment thereof by mortgage on the premises, and this appears to have made the deal satisfactory to appellants and Elizabeth, who, at the time of the trial, was the temporary guardian of James Mutch.

There is not such evidence of trickery, fraud, bad faith, inequitable conduct, inadequacy of consideration or mental capacity on the part of Mr. Mutch, or other facts or circumstances, as to justify a court of equity, in the exercise of a sound judicial discretion, in refusing specific performance of the terms of the contract.

III. It is urged by appellants that the testimony of the attorney who was consulted by James Mutch and his daughter and employed by them to procure the indorsement upon the back of the contract is incompetent, and that the matters testified to were privileged. Some of the testimony comes very close to the line, if the same is not, to some extent, possibly overstepped; but we think the most essential part of his testimony within the rule declared in *Caldwell v. Meltveldt,* 93 Iowa 730, and stated by Jones on Evidence, Section 752. But we must presume that the trial court disregarded the evidence vulnerable to the objections made, and that its conclusion was based solely upon the admissible evidence. *Secor v. Siver,* (Iowa) 161 N. W. 769.

3. WITNESSES: competency: attorney and client: confidential communications.

4. APPEAL AND ERROR: presumptions: equity causes: disregarding incompetent evidence.

IV. Appellants place some reliance upon the fact that the land in question has been leased, and that they were unable to deliver possession free therefrom. This was a defect that the party seeking specific performance of the terms of the contract could waive. *Donaldson v. Smith,* 122 Iowa 388; *Brown v. Ward,* 110 Iowa 123; *Wetherell v. Brobst,* 23 Iowa 586.

5. SPECIFIC PERFORMANCE: defenses: defects in title: waiver by plaintiff: effect.

*Ormsby v. Graham*, 123 Iowa 202, relied upon by appellants, is not in conflict with the holding of this court in the above cases.

Upon the whole record, we think the conclusion of the trial court was right, and the judgment below is—*Affirmed*.

Gaynor, C. J., Weaver and Preston, JJ., concur.