NETTIE W. ORR et al., Appellees, v. S. P. GRAYBILL et ux., Appellants.

No. 46852.

JUNE 18, 1946.

William P. Welch, of Logan, for appellants.

Wright & Kistle, of Council Bluffs, for appellees.

MANTZ, J.—█ The plaintiffs, Nettie W. Orr and William L. Orr, on September 5, 1944, filed an equitable action against S. P. Graybill and Alice Graybill, asking specific performance of a certain real-estate contract entered into on April 21, 1944, wherein defendants agreed to sell to plaintiffs certain real estate situated in the town of Persia, Harrison County, Iowa. Plaintiffs alleged full and strict compliance upon their part with the terms of said contract and that the sellers had refused to carry out their agreement, and asked that the court decree specific performance thereof.

On August 27, 1944, Guy Graybill, a son of the defendants, filed in court an application for the appointment of a guardian ad litem and attorney to represent S. P. Graybill, and alleged that said S. P. Graybill was mentally incompetent and incapable of transacting business on April 21, 1944. Said application was supported by an affidavit of Floyd G. Sarff, M. D. On September 28, 1944, the court appointed William P. Welch, of Logan, Iowa, as guardian ad litem and attorney for such defendant.

The other defendant, Alice Graybill, by separate answer, alleged that she had executed the contract sued upon by reason of undue influence exercised over her by Nettie Orr, one of the plaintiffs. The guardian ad litem, by separate answer, pleaded the mental incompetency and incapacity of S. P. Graybill to enter into said contract. Both defendants pleaded that in the making of said contract they had been overreached therein and they asked that plaintiffs' petition be dismissed, and by cross-petition prayed that said contract be canceled and that the title to said property described therein be quieted in them.

The affirmative allegations of the answer of Alice Graybill and that of William P. Welch, guardian ad litem, and those of the cross-petition were directly controverted by plaintiffs' reply and answer.

The cause was tried in November 1944, and on January 30, 1945, the trial court, by findings of fact and decree, found for the plaintiffs, decreed specific performance of the contract, and specifically found that the defendants had failed to sustain their pleaded claim that S. P. Graybill was mentally incom-

petent and incapacitated and unable to transact business on April 21, 1944, or that on the same date Alice Graybill had been induced to sign the contract by reason of undue influence exercised over her by Nettie Orr and/or that in making the contract the Graybills had been overreached. The cross-petition was dismissed. From such decree an appeal has been taken.

I. The action is in equity and is triable here de novo.

The record abundantly shows that the contract which appellees seek to enforce was freely entered into and was properly executed by all of the parties thereto. Such being the case, the burden is upon the appellants to show the pleaded grounds for setting it aside. This appellants have sought to do and argue that the evidence supports such claim.

Following hearing, the trial court sustained the contract of April 21, 1944, and ordered it specifically enforced according to its terms. In so holding the court dismissed appellants' cross-petition.

Following a study of the record we are of the opinion that the finding and decree of the trial court was correct and that it did not err in sustaining the contract, ordering its specific performance, and dismissing the cross-petition of appellants.

II. In this appeal various points and propositions have been set out and argued. Some of these are so related that appellants have combined their briefs and arguments relating thereto. This method has resulted in considerable repetition and commingling of facts as applied to the various questions raised.

In considering the questions raised we will, in some instances, depart from the order as set forth by appellants. However, all questions properly raised will be considered.

Basically, the controlling questions relate to the claimed mental incompetence and resulting incapacity to contract of S. P. Graybill on April 21, 1944; whether Mrs. Orr had at that time exercised undue influence over Alice Graybill to such extent as to control her actions and induce her (Alice Graybill) to sign and execute said contract; and the right of the trial court to sustain the contract and to grant its specific performance under the record herein.

While other questions have been raised, we think they are incidental to and involved in the ones set out above. The storm center of the controversy revolves around what happened at the Graybill home on April 21, 1944.

While the incidents of that meeting are not the subject of extreme conflict, the real controversy arises out of the construction placed thereon by the opposing parties.

We will set forth as briefly as we can consistently the incidents of such meeting, and, in addition, some other matters which may throw some light thereon. In so doing, we will necessarily be obliged to indulge in repetition of some matters hereinbefore set out.

Nettie Orr, then aged fifty, had known the Graybills since she was seven years old. She and Mrs. Graybill were close friends. On previous occasions she had solicited the Graybills to buy their home. In the spring of 1944 the Orrs rented their farm and decided to move to Persia. On April 21, 1944, Mrs. Orr went alone to the Graybill home and found Mr. and Mrs. Graybill there. It was the day for the Aid. She arrived at the house about one o'clock. Mrs. Graybill met her and said: "Nettie, I am not ready for Aid." Mrs. Orr replied: "That isn't my mission; I'm going to see if you folks want to sell your house. We can pay you $3,800 if you care to sell. If you don't I'll be on my way." Mr. Graybill came in and Mrs. Graybill said: "Sim, Nettie offered us a cash price of $3,800 for the house." Mr. Graybill sat down by his wife for a minute and then turned to her and said, "Are you ready to sell?" She said, "Sim, if you want to sell it is all right with me." Mrs. Orr suggested that a Mr. Becker draw the contract. There was talk of the price and time of possession. Mrs. Orr wanted possession on August 1st; Graybill said he could not give possession until September 1, 1944, and that $1,000 down was all right. Mrs. Orr then went downtown and got her husband and both looked over the house. Following, Mr. Orr asked, "Who shall I write the check to, Mr. and Mrs. S. P. Graybill?" Mrs. Graybill said, "Sim takes care of his own business." Mr. Orr then wrote a check for $1,000 and gave it to the Graybills. Orr asked for an abstract to get the prop-

erty description. When Orr handed the check to Mr. Graybill, the latter said, "Billie [Mr. Orr], I don't carry a dime's worth of insurance on the place." Mrs. Orr testified that her husband said, "I'm scared to death not to have a place insured." After the Orrs got the abstract they went to the hardware store of Mr. Becker and asked him to prepare the contract. He did so, drawing it in duplicate, getting the description from the abstract and the sale information from the Orrs. They signed both copies and then Mrs. Orr phoned the Graybills that the contract was ready for them to sign. The Orrs then went back to their farm home, returning later to get their copy of the contract signed by all parties. Mr. Orr had the property insured the next day and then returned the abstract to the Graybills.

William Orr testified that on April 21, 1944, he and his wife came to Persia; that he was getting some repairs; that his wife, Nettie, came downtown and they went to the Graybill home; that Mr. and Mrs. Graybill were there and another man, a stranger to him, was in the kitchen, where Orr saw him while being shown the house. He testified that he was shown through the house; that he had never been there before; that his wife said she had bought the house and that he was to write a check for the down payment of $1,000; that Mr. and Mrs. Graybill said they could get possession September 1st; that the Graybills said there was to be $1,000 down and the balance September 1st; that when Mr. Orr asked to whom the $1,000 check was to be made payable Mrs. Graybill said to make it to S. P. Graybill. He testified that Mr. Graybill said he had no insurance on the house and that he asked for the abstract to get the description for the contract and for getting insurance; that Mrs. Orr suggested that Mr. Becker, a notary public, draw the contract, and the Graybills were agreeable. He testified that he and his wife went to the Becker store and told Becker the terms; that Becker made the contracts in duplicate and that he and his wife signed both and then went home; that he got the contract from Becker in the evening; that it had been signed by the Graybills. The next day Orr had the house insured at Shelby and returned the abstract to Mr. Graybill at Persia. Orr testified that he

was at a family meeting at the Graybill home on August 16, 1944, and offered the balance of $2,800 in cash; Mr. and Mrs. Graybill were there; also the son, Guy; that the latter said he would not accept the money and was not going to give the property up or perform the contract and would fight the case.

Mr. Becker, who drew the contract, testified that he first learned of the deal from Mr. and Mrs. Orr; that Mrs. Orr said she had bought the Graybill place; learned of the price and terms by asking them; got the description of the property from the abstract; testified that the Orrs signed the contract as drawn and that later the Graybills came. Becker presented them with the contract and spoke to Mr. Graybill and asked him if the $1,000 down and the $2,800 on September 1st were correct and Graybill said, "Yes, sir;" that witness asked Mr. Graybill as to possession on September 1st and he said it was all right. Witness said: "I forgot to put hundred in there, thirty-eight hundred dollars, and I spoke to them about it. I mean I spoke to the Orrs and Graybills." They both signed in the presence of Becker and later a copy was given to Mr. Orr.

S. P. Graybill, though present in court, did not take the witness stand.

Mrs. Graybill testified, giving her version of what took place on April 21, 1944, when the contract was made. In some respects it conflicts with the evidence given by the Orrs; yet, in its essentials it does not vary much from that given by them.

Mrs. Graybill said that when Mrs. Orr came she was not feeling well and was nervous and worried about a son in service; that her husband was there but was not well, had been ailing for some time. Mrs. Graybill, in telling of the visit of Mrs. Orr on April 21, 1944, said she sat down, they talked a little bit, and Mrs. Orr said: "I'm going to ask you again to buy your home." Witness said she did not answer for a little bit, and said, "I don't know what to say," and said to Mr. Graybill, "What do you say?" She said Mrs. Orr then asked him if he would sell it and he studied a little bit and said, "Well, yes," he would, and she made her price. She said: "I'll give you $3,800." Witness said Mrs. Orr tried to buy the house in 1943. She told of the trip of her husband and her-

self to Becker's store and the signing of both contracts and taking one home with them.

On cross-examination Mrs. Graybill said she was sorry the deal was made; after Mr. Graybill said he would sell, Mrs. Orr named the price of $3,800, and she supposed that Mr. Graybill said he would take it but she did not remember his words. Orr asked for the abstract to get the numbers for the contract; said he wanted to get the house insured; Mrs. Orr had gone downtown and got Mr. Orr; he looked through the whole house, including the basement; there was talk as to a down payment of $1,000; said she and her husband agreed to that; Orr wrote the check, inquired to whom he should make it payable; told him to make it out to S. P. Graybill; "that was the way our business was always done"; Orr wrote it out and left it on the table. Mrs. Orr spoke of going down to the Becker store to have him write the contracts; the Orrs then left; later Mrs. Orr phoned from the Becker store and said the contract was ready to sign; witness and her husband went down; Orrs were not there; the contracts were on the table; the Orrs had signed. She took one and read it and compared it with the other to see if they were alike. Mr. Graybill looked at the other and said there was a mistake: the one hundred was left out after the typewriting; said he would correct it by writing the words in there. He also put the "E" after the name "Alice." Witness and her husband both signed. Mr. Graybill got a copy and they had had it since that date; witness knew she was signing a contract to sell the house for $3,800 and was to give possession September 1st; thought her husband did not know he was signing for the same thing. Mr. Orr returned the abstract next day and thanked them for the use of it. Talked to her son, Guy, on Saturday and got the impression from what he said that it did not suit him. On Tuesday Guy asked witness to phone to Orrs to come; witness told Mrs. Orr that she was sick and Mrs. Orr said she realized the conditions and would do the right thing by them; told Mrs. Orr that Mr. Graybill was not in a sane condition; said nothing like that on Friday to Orrs or Mr. Becker; said husband had sold Yorkshire property awhile back; had made the deal and got the

money; does not think Mr. Graybill said anything on Tuesday; neither Mr. Graybill nor witness told the Orrs on Tuesday they intended to repudiate the contract; said that the contract represented the agreement; said her husband went to the polls to vote on November 7th; that he got a ballot and went into a booth and returned it to the officials.

Appellants offered several other witnesses who testified concerning the mental and physical condition of S. P. Graybill; they testified as to changes in the actions, attitude, and demeanor of S. P. Graybill during the past few years. One witness who had lived next door to the Graybills for twenty-one years was asked her opinion as to whether Mr. Graybill was of sound mind and able to transact business on April 21, 1944, and answered: "Well, I just wouldn't hardly feel competent to answer a question like that." Later, in answering a leading question as to what the witness thought as to whether Graybill could take care of his end of a business deal like selling a house, over objection answered, "Well, I wouldn't think so."

There is some evidence in the record that for the past few years S. P. Graybill had been in failing health. Dr. Sarff, of Logan, located about fifteen miles from Persia, testified that he had never treated S. P. Graybill professionally until either August or September 1944, but had doctored members of his family off and on for about eight years. Dr. Sarff described himself as a country doctor and not a specialist on insanity. He examined Graybill three times, August 16th, August 23d, and September 8, 1944. He testified that Graybill was afflicted with hypotension, or low blood pressure, hypertension, chronic nephritis, and arteriosclerosis; that he had the last named to a marked degree. After detailing the results of his observation and examination Dr. Sarff said it was his opinion that S. P. Graybill was mentally unsound on August 16, 1944. He stated that the same condition was reasonably probable on April 21, 1944. On cross-examination Dr. Sarff said that he did not remember seeing Graybill from 1941 to August 1944, and that he had never treated him prior to that time. He stated that arteriosclerosis (hardening of the arteries) was a very common disease and usually comes on with advancing age; said that on each occasion Mr. Graybill came to his office in Logan and the

first time his son Guy was with him; the last trip his wife was along. He stated that he talked with Graybill, who told him of his condition; that he was not well; that he understood and answered questions propounded and accepted advice given him. He further testified that on the other visits the routine, so far as questions and responses were concerned, was about the same as the first visit.

Dr. Sarff said that he examined Alice Graybill on September 10, 1943, August 16, 1944, and the last time, October 28, 1944; she came to his Logan office; that she explained her condition and answered promptly; that she had physical ailments: "Everybody is sick in some kind of a way at Mrs. Graybill's age"; that she complained of a chronic ailment she had for a number of years—a neck pain, stiff neck; said she was nervous and he treated her by a nerve sedative at that time. Over objection, Dr. Sarff expressed an opinion that on August 16, 1944, and on April 21, 1944, S. P. Graybill, because of his condition, was incapable of understanding the nature and character of business transactions. Dr. Sarff does not claim that either S. P. Graybill or Alice Graybill was insane at any time he saw them.

The record shows without dispute that when Mrs. Orr went to the Graybill home on April 21, 1944, and asked the Graybills if they would sell the property, S. P. Graybill took part in the discussion and said he was willing to sell and agreed to the various terms, such as price, down payment, possession, etc.; that he made no objection to any of such. When Mrs. Orr said they would want possession August 1st, he said they could have it September 1st; that his son was coming back from California and "we are going out on the farm with him." The evidence shows without dispute that the parties agreed that Mr. Becker, an acquaintance of both parties, would draw the contract and that it was there drawn and signed by all the parties. The Orrs went down and made arrangements with Becker to prepare the contract. He did this; they signed, and phoned the Graybills that it was ready for their signature. Mr. Orr at the home had written the $1,000 check to S. P. Graybill and left it with the Graybills. When the Graybills

came to the Becker store the two contracts were there. S. P. Graybill examined one of them; Mrs. Graybill, the other. Mrs. Graybill wanted to make sure they were the same. According to Mrs. Graybill, when Mr. Graybill was reading the contract he observed that Mr. Becker, in typing in the consideration had put it as "Thirty-eight and no/100 Dollars," thereby omitting the words "one hundred" after the words "thirty-eight." We quote the record as shown by the cross-examination of Mrs. Graybill:

"Q. Did you see Mr. Graybill write the word 100 in here after the words in typewriting? A. Well, I believe so. Q. Yes, he caught that little mistake and said he would correct it, didn't he, by writing the word in there * * * A. I believe those were the words he said. Q. He put the E after Alice up here in your name? A. Yes, sir * * * Q. Did you call his attention to the fact that that was the way your name should be, Alice E? A. Yes, sir. I did. Q. And he put in the E at your suggestion? A. I told him that."

Alice Graybill testified that she signed and that her husband signed and that they knew they were selling the house for $3,800, with $1,000 paid down and balance of $2,800, and possession to be given on September 1, 1944. She also testified that the Orrs had tried previously to buy the house and that she had written a letter to her son telling him of their offer. She makes no claim that there were any threats made or any fraud practiced on her.

Counsel for appellants lays great stress upon the claim that undue influence existed in that it took Mrs. Orr from one o'clock until five o'clock to persuade the Graybills to complete the contract. This claim, if true, falls far short of what is claimed for it. Mrs. Orr came about one p. m. Being an old friend, she naturally visited. When she asked if they would sell and they answered in the affirmative she went downtown to find Mr. Orr. He had never been in the house and when he came examined it throughout; they then talked of the deal, price, down payment, terms, etc., about its description, lack of insurance, who would draw the contract. Then followed the departure of the Orrs and their contacts with Mr. Becker, the

drawing of the contract, signing, phoning to the Graybills. Mrs. Orr said that following their signing and the phoning to Graybills she and her husband went back to the farm—he to do the chores, she to do housework. Later Mr. Orr returned and got their copy of the contract. Naturally, all of these matters took time. We attach little importance to such claim.

It is difficult to see wherein there was anything unusual in what was done at that time. According to the record all of the details of the sale had. been agreed to at the home; what Becker did was simply to reduce the agreement to writing—something agreed to by both parties.

While at the Graybill home Mr. Orr spoke of the description of the property to be inserted in the contract. He was advised by the Graybills that they had an abstract showing the description. He spoke of the insurance and testified that S. P. Graybill said he had none, to which Orr stated that he wanted some at once. They gave him the abstract and Becker got the description of the property therefrom and the next day Orr went to Shelby and had the house insured. The day following he returned the abstract to the Graybill home. At that time nothing was said to Orr by either of the Graybills about the contract or its terms. They then had the check for $1,000 and a copy of the contract.

However, the trouble started when the children learned that the house had been sold. At that time there were six children, all grown, four of whom lived near Persia; one son, Chester, lived in Anita; another, Lloyd, was in California and in the service. Guy, being advised of the sale by his mother, contacted all the children except the one in California. He phoned to Chester and visited the others personally. They discussed the matter among themselves and with their parents and on the suggestion of Guy there was a meeting at the parental home the following Tuesday. At that time there were present S. P. Graybill and Alice Graybill, the parents; Guy, the son; Edna Hansen and Ida Stahlnecker, the two daughters. According to the record, they talked matters over and then asked Alice Graybill to phone the Orrs to come over. Before the Orrs came it was decided to ask them to cancel the contract and call off the deal. The Orrs came and there was some conversa-

tion upon the subject; some of it was to the effect that the Orrs had taken advantage of Mr. and Mrs. Graybill in securing the contract; that S. P. Graybill was incapable of transacting business; that Alice Graybill was sick and nervous; that the children did not want the parents to sell and they had no place to go; and some suggestion that the price was inadequate. The Orrs were asked, as old friends and neighbors, as being younger and more able to get another home, to surrender the contract. The Orrs stated they had bought the place fairly and wanted it for a home, as they had to move. They left without promising anything except to say that they would think it over.

At the trial the three children who were present at the meeting, and their mother, testified as to the incidents and happenings thereof. The son from California, who returned the day before the trial, likewise testified. All present gave their versions of what was there said. Some of the statements of the various ones present are in conflict. We have gone over the record. We are of the opinion that Mr. and Mrs. Graybill were satisfied with their deal until the children came into the picture. They knew that at some time during the past the Orrs had tried to buy the property. Some of the children did not want them to sell. One stated that he had written that it was their property and they could sell if they pleased, but advised against selling. Guy testified that his father had bought the home in 1929 and had paid $4,750 for it and had spent something by way of repairs. It could be inferred that he opposed the sale on account of the price. Guy seemed to be the leader at the Tuesday meeting. He called the meeting and made the arrangements. He testified that he told the Orrs:

"We had figured that they slipped in and took advantage of our parents with us children unbeknown to it and that our parents didn't figure on selling that property and they had always asked—I told them they had always asked us before what we thought about things."

Guy said he told his folks not to cash the check. Said he

did not object to the price. From the cross-examination of Guy Graybill we quote the following:

"Q. So the only thing you were objecting about was the fact that your mother and father had sold the house? A. That's right. Q. That was because you didn't want them to sell it, wasn't it? A. It wasn't just my idea. Q. Well whose idea? A. All the rest of the family. Q. By that, you mean your brother who wasn't there? A. That's right. * * * Q. All they were complaining about then was the fact that—or, I mean, objecting about was the fact that your mother and father had sold the house? A. That's right."

He further stated that the brothers and sisters had made up their minds that they would not permit their father and mother to carry out their contract.

While this same witness claimed that his father was mentally incompetent, yet he tells of renting from him, sharing the rents, his father selling his share, settling rents with tenants in 1941, 1942, and 1943, of selling his share of the crop rental and banking the proceeds.

Edna Hansen, a daughter, told of the meeting on Tuesday, of having been there a day or two before and the father and mother told of the sale. Witness complained to them of having sold without the children's consent. Said her father said maybe they should not have sold it. Witness asked them what they were going to do and they said they did not know. Witness said she had no doubt her father knew that he had sold the place; that Guy came to see her about it and asked what she thought of it and she answered that she "didn't know what in the world they would do."

Ida Stahlnecker, a daughter, testified that she was at the Tuesday meeting; that her brother told her of the contract and the meeting; that the Orrs came and Mr. Orr said if he gave up the contract that he wouldn't have a cover to put over his head; that witness told him (Orr) that he was a lot younger man than her father and a lot more able to go out and hunt a new cover for his head than her father was.

Simeon Graybill testified that once or twice before April 1944 he learned that the Orrs were trying to buy the place;

that when his mother asked his advice he said no; told his father he did not want him to sell the place. Said his father sold a property at Yorkshire in 1942 without consulting him.

At the Tuesday meeting the record shows that S. P. Graybill had little or nothing to say. The evidence seems to imply that at no time was he a garrulous person. Judging from the aggressive acts of some of his children, it is not a matter of wonder that he had little to say. Apparently he was elbowed to the side-line seat while his children present took active charge. No doubt the children had the best interests of their parents at heart but this would not furnish them with a legal excuse for taking charge of the affairs of their parents. A study of the record satisfies us that it was the acts and attitude of the children which induced the parents not to carry out their contract.

Some of these same children question the mental capacity of their father. Taking the record, we are forced to conclude that in a business way the father had not been a failure. He managed his farm, had business deals, and seemed perfectly capable of looking after his own interests. These same children apparently never considered him incompetent to act in business deals up to the present one; never suggested a guardian for him or his property. Under the exigencies of a lawsuit the son Guy somehow conceived the appointment of a guardian ad litem—all for litigation purposes.

As bearing upon the appellants' claim of mental incompetence and resulting incapacity to transact business as applied to S. P. Graybill, we think there are facts and circumstances in the record negativing such claim. Graybill had owned the Persia property for over fifteen years; a part of the time it had been rented. While there exists some dispute in the record, we think there is ample evidence to show that S. P. Graybill had always looked after his own business, had managed real estate, entered into leases with tenants, taken and disposed of his share of the rents, paid the taxes, had bank accounts, made deposits, wrote checks, mortgaged real estate, paid interest and principal, sold the Yorkshire property in 1943 and received the proceeds. While the record shows that during the past few years usually some of the members of the family

went with him, we think it can fairly be inferred that such was because of his physical condition. Very frequently rheumatic sufferers need aid in getting about physically. There is nothing in the record to indicate that any of his business was controlled or dictated by any member of his family. True, he consulted their wishes in various matters—a laudable quality —but he made his own decisions.

In effect, the present suit, so far as appellants are concerned, is to cancel and set aside a written contract. Controlling herein is a fact situation. Taking the entire record, we hold that there is ample evidence to sustain the finding and decree of the trial court. We hold that the evidence shows affirmatively that the contract assailed was fairly, understandingly, and voluntarily entered into by all of the parties thereto. In so holding we find that appellants have failed to show that at the time of said contract S. P. Graybill was mentally incompetent and consequently incapacitated; also, that the signing of such contract by Alice Graybill was not induced by any undue influence exercised over her by Nettie Orr or that in the transaction the seller had been overreached.

We think that the evidence fairly considered fails preponderantly on behalf of the appellants. Bardsley v. Spencer, 215 Iowa 616, 244 N. W. 275; Foster v. Foster, 223 Iowa 455, 273 N. W. 165, and cases there cited; Mastain v. Butschy, 224 Iowa 68, 276 N. W. 79; Mitchell v. Mutch, 180 Iowa 1281, 164 N. W. 212.

In connection with the foregoing we note that appellants lay special stress upon their claim that S. P. Graybill was at such a stage of mental incompetency that he lacked capacity to contract. Several lay witnesses and one medical witness have given opinions along that line. None claims that he was insane. The facts detailed by them, in part at least, controvert such opinions. Few of the actions and movements of S. P. Graybill indicate any abnormal tendencies. He was seventy-four years old. Naturally, there would be the inevitable slowing up in activities, physical and mental. Special stress is made of the claim that he had to be assisted at times. The record shows that he walked unassisted into the courtroom; also, to the office of his attorney. Who has not seen some per-

son suffering from rheumatism who needed aid in getting about? His mind may have suffered to some extent, due to age and hardening of the arteries. The trial court had the advantage of seeing S. P. Graybill and the other witnesses in court and of observing the demeanor of each while upon the witness stand.

Neither the trial court nor this court is bound to accept as a verity the opinions of either medical or lay witnesses, even if competent to testify, in the face of facts and circumstances tending to contradict such opinions.

Dr. Sarff was engaged in the general practice of medicine in Logan, while S. P. Graybill lived at Persia, a town about fifteen miles distant. While Dr. Sarff had seen S. P. Graybill on a few occasions he never had treated him professionally until August 1944. It seems rather significant that his first visit to see Dr. Sarff was on the same day appellees served notice on him at his home in Persia demanding that he carry out his contract to convey. Dr. Sarff, on the first office call, saw S. P. Graybill for about thirty minutes. The two subsequent examinations were at the office of Dr. Sarff, the length thereof not being shown. At the office Graybill complained of rheumatism, of pain in his legs, back, and arms. An examination verified his statements. We quote from the record (cross-examination of Dr. Sarff) as to the September call of S. P. Graybill:

"Q. And you examined him then in September? A. That's right. Q. Was there anything different in the September examination than in the other two? A. No. Q. Did you have any difficulty making him understand what you asked him at that time? A. No. Q. No. Did you observe that he responded about the same then as in August? A. His response was the same. Q. He understood your questions? A. Yes. Q. And your talk to him all right? A. Yes. Q. You had no difficulty making him understand, did you? A. No."

It seems to us that such testimony directly negatives the opinion of Dr. Sarff that S. P. Graybill in August and April 1944 was mentally incompetent to such an extent as to incapacitate him from transacting business.

"A party cannot avoid a contract, free from fraud or undue influence, on the ground of mental incapacity unless it be shown that his insanity was of such character that he had no reasonable perception or understanding of the nature and terms of the contract." (Citing cases.) Swartwood v. Chance, 131 Iowa 714, 715, 716, 109 N. W. 297, 298.

See, also, Mitchell v. Mutch, supra; Rickman v. Houck, 192 Iowa 340, 184 N. W. 657; Mathews v. Nash, 151 Iowa 125, 127, 130 N. W. 796; Utterback v. Hollingsworth, 208 Iowa 300, 225 N. W. 419; Evers v. Webb, 186 Iowa 1172, 173 N. W. 264; Gilligan v. Jones, 226 Iowa 86, 283 N. W. 434; Bishop v. Leighty, Iowa, 237 N. W. 251.

III. The final question to be considered is that raised by appellants wherein they claim that the trial court abused its discretion in ordering specific performance. We have already held in this opinion that the contract declared upon was valid and was fully and fairly entered into.

It is true that this court has held that specific performance is not an absolute right. It rests in the sound legal discretion of the trial court. In a proper case it is not to be denied unless some good reason is shown for so doing. In the case of Shisler v. Catholic Cem. Imp. Assn., 207 Iowa 306, 222 N. W. 838, this court held that the granting of such redress was not a mere matter of caprice on the part of the chancellor. See, also, Cohen Bros. Iron & Metal Co. v. Shackelford Brick Co., 197 Iowa 674, 198 N. W. 318; Carter v. Schrader, 187 Iowa 1245, 175 N. W. 329; Mitchell v. Mutch, supra; Kurtz v. Gramenz, 198 Iowa 222, 198 N. W. 325; Dee v. Collins, 235 Iowa 22, 24, 15 N. W. 2d 883, 885.

In this case the trial court was in a position to view the entire situation. No special hardship or inequity will result in the carrying out of the contract. Appellants sold their home at a price agreeable to them and there is nothing to indicate that the price agreed upon was inadequate. Appellees had rented their farm and were required to move. To do this they purchased the Graybill home. All appellants need to do is to move. By selling to the Orrs they knew they would be required to move; in fact, they fixed the time: September 1, 1944. We

think that had the children of the Graybills not objected that is what Mr. and Mrs. Graybill would have done.—Affirmed.

All JUSTICES concur.