Отто A. BJORNSTAD, JR., et al., appellees, v. THOMAS G. FISH et al., appellants.

No. 49241.

(Reported in 87 N.W.2d 1)

December 17, 1957.

Kelly, Spies & Culver, of Emmetsburg, James & Greer, of Spencer, and Linnan & Lynch, of Algona, for appellants Thomas G. Fish and Earl Hoover, as executors of the estate of Carrie G. Birdsall, deceased.

James & Greer, of Spencer, for appellant Tresabel Prunty.

Loth & Melton, of Fort Dodge, and Alden D. Avery, of Spencer, for appellees.

WENNERSTRUM, J.—The controversy, which has resulted in this appeal, concerns the interpretation of a claimed option agreement to purchase an interest in a business and office building in Spencer, Iowa. The plaintiffs' action is in equity and their theory is the partnership which owns the building should be liquidated. There was an original agreement relative to ownership. Later certain parties to it entered into a contract regarding a possible purchase of the respective interests of the parties in the building property. It is this agreement which is in controversy. The plaintiffs sought in their action for liquidation and termination of the partnership to have the agreement of purchase carried out. The trial court held in their favor. The defendants have appealed.

On March 2, 1925, Articles of Copartnership were entered into by R. W. Hanson, J. O. Birdsall, Otto A. Bjornstad, C. Ben Bjornstad, C. P. Buckey, J. J. Cairns, Cornwall & Cornwall, J. A. Wahlstrom, Barbara Cornwall, M. M. Moulton, and Homer E. Pitcher. The Articles provided: the partnership should be known as the McAllister Block Company, the business to be carried on by it was the purchasing from the First National Bank of Spencer, Iowa, of the building named and to own, sell, lease, mortgage or otherwise to encumber it. It was further provided the purchase price of the building was to be $65,000, that $30,000 of that amount was to be paid in cash on or before March 2, 1925, and the balance of $35,000 was to be represented by a note or notes secured by a mortgage on said property due five years from March 2, 1925. It was also provided in the agreement the title to the real property was to be taken in the name of R. W. Hanson, one of the copartners, but for the benefit of the other copartners, and that the said R. W. Hanson was to execute and deliver a note or notes and a mortgage to the First National Bank and thereafter he was to execute and deliver to the executive committee of the copartnership a deed of conveyance in blank but

subject to the mortgage previously mentioned. This deed was to be held by the executive committee subject to the order of the copartners.

In the partnership agreement there were included the following provisions which are of import in connection with the present litigation: "7. The total investment of Sixty-five Thousand ($65,000) Dollars shall be divided into sixty-five (65) shares of One Thousand ($1000) Dollars each—Thirty (30) of which shares shall be issued by the chairman and secretary of the copartnership and delivered to the copartners in proportion to their respective interests in the property, and Thirty-five (35) of said shares shall be held by the copartnership and issued to such of the copartners as may obtain a further interest in said property by payment of the face value thereof to the First National Bank on the mortgage indebtedness, but no such payment shall be less than One Thousand ($1000) Dollars and shall be in even thousands. Each copartner shall have the right to thus acquire additional shares in the property at any interest paying date. * * *

"9. It is further agreed that no copartner shall sell and transfer his share or interest in the property without first giving the other copartners thirty (30) days notice of his intention to sell the same and giving the copartners or present shareholders the first right to purchase same. In case any copartner shall dispose of his interest or any part thereof to one not already a member of the Copartnership, such purchaser shall sign the Articles of Copartnership and agree to its terms and conditions before he shall be entitled to share in any profits."

In 1931 the building was destroyed by fire and a new structure was built by the partnership. Prior to the fire the mortgage indebtedness had been retired and additional certificates of ownership had been issued, which with the original certificates totaled $65,000.

In the original contributions for the purchase of the property the partners contributed $1000 for each of the shares issued to them. R. W. Hanson paid in $10,000, J. O. Birdsall $5500, Otto A. Bjornstad $3500, C. Ben Bjornstad $3000, C. P. Buckey $2000, J. J. Cairns $1000, Cornwall & Cornwall $1000, J. A. Wahlstrom $1000, Barbara Cornwall $1000, M. M. Moulton

$1000, and Homer E. Pitcher $1000. As noted in paragraph 7 of the partnership agreement it was provided that on the payment by any of the partners of $1000 on the mortgage indebtedness such partner should have the right to thus acquire additional shares in the property.

R. W. Hanson, who had made the largest contribution of any of the partners, died on February 3, 1941. He left no direct descendants. However, his heirs were represented by a Danish Consul. At the time of his death he owned twenty-two and one-half shares. It appears Hanson had agreed his interest in the property could be bought from his estate by J. O. Birdsall and the Cornwalls for $1000 per share. Although this agreement was not in writing the Danish Consul and his attorneys, after satisfying themselves relative to the agreement, concluded it should be carried out. The Hanson shares were appraised at $1000 each by reason of the agreement and under an order of court were sold for that amount. On account of this transaction J. O. Birdsall obtained four and one-half of the Hanson shares, Mrs. J. O. Birdsall obtained two shares and the remaining shares were prorated among the Cornwalls and the other partners in the building partnership. This prorated agreement whereby all the remaining partners obtained a proportionate interest in the partnership property was agreed to by J. O. Birdsall and the Cornwalls.

During the period the details of the transfer of the Hanson shares were being worked out, the agreement, which is the basis of this litigation, was entered into by the Birdsalls and Wilson and R. M. Cornwall and Ruth M. Cornwall. This agreement was dated May 27, 1941, and is as follows:

### "MEMORANDUM OF AGREEMENT

"WHEREAS, the undersigned are the owners of certain undivided interest in the building located on * * *, known as the McALLISTER BLOCK, and

"WHEREAS, it is the intention and desire of all parties hereto that in the event any of the undersigned parties desire to sell and dispose of their respective interest to parties other than the undersigned, or in the event of the death of any of the undersigned parties without leaving members of their own immediate family

to whom the property shall pass, then the survivors of the undersigned shall have the first right to buy the stock according to the following terms:

"It Is Therefore Agreed: That during the lifetime of the undersigned they shall have the right to sell, mortgage, or handle their stock as they desire, but in the event the same shall be offered for sale to the parties not executing this contract, the party desiring to sell shall give to the parties signing this contract the first right to buy the stock on the terms and conditions on which it may be offered to third parties or strangers.

"In the event J. O. Birdsall or Carrie G. Birdsall should die, it is their intention that the stock should pass to the survivor, but in the event both J. O. Birdsall and Carrie G. Birdsall shall die, then their executor shall be and he is hereby instructed to sell said stock to R. M. Cornwall or Wilson Cornwall, or either of them, at the agreed price of $1000 per unit or share according to the books of the company.

"In the event R. M. Cornwall, Wilson Cornwall or Ruth M. Cornwall should die, the stock owned by them shall pass to her or his legal heirs, but in the event any of said parties, or their legal heirs should desire to sell said stock during the lifetime of J. O. Birdsall or Carrie G. Birdsall, then said stock shall be sold to Carrie G. Birdsall and J. O. Birdsall, or either of them, at the agreed price of $1000 per share.

"This agreement shall be void upon the death of J. O. Birdsall and Carrie G. Birdsall and the disposition of their interest under the above provisions.

"The reason for making this agreement is that J. O. Birdsall, R. M. Cornwall, and Wilson Cornwall have worked together in handling this building and desire that their stock shall pass to and be kept in their respective families so long as the families desire, and upon the death of said parties and their immediate families, the stock shall pass to the other parties as above provided.

"This agreement shall be binding upon the undersigned parties, their heirs, executors or legal representatives and each of the undersigned hereby request and direct that in the event of their death that this Agreement be carried out by their respective legal representatives."

Following the death of Mr. Hanson, J. O. Birdsall acted as secretary of the company from the year 1941 until a short time before his death. He gave full attention to the management of the building, the collection of the rents, the making of tax reports and kept all the records. Mr. and Mrs. Birdsall were elderly and had no children. Mr. Birdsall died testate on January 4, 1946, and his widow, Carrie G. Birdsall, was named executrix and principal beneficiary under his will. In the inventory which she filed in her husband's estate she valued the McAllister Block certificates at $1000 for each $\frac{1}{65}$ interest. In the inventory following the listing of the certificates previously mentioned there was set out the following: "Said McAllister Block Company certificates are subject to a contract of sale dated May 27, 1941, for the sum of $1000 for each $\frac{1}{65}$ interest." On September 7, 1946, the J. O. Birdsall certificates of ownership in the building were canceled and new certificates were issued to his widow.

Mrs. Birdsall died on July 13, 1955, and at the time of the trial concerning the matters here in litigation her estate was in the process of being probated in the Clay County District Court. At the time of her death she was the owner of eighteen and a fourth shares of the sixty-five shares outstanding. Under the agreement previously set out the purchase price of these shares would amount to $18,250. It is shown that Wilson Cornwall and R. M. Cornwall have assigned proportionate interest in the Birdsall agreement to C. Ben Bjornstad and to the trustees of the Otto A. Bjornstad estate. A tender of the claimed purchase price of $1000 per unit has been made and the total amount of $18,250 has been paid to the Clerk of the Clay County District Court. A demand for transfer of Mrs. Birdsall's shares to the Cornwalls and the Bjornstads has been made but refused.

The defendants' claims for reversal, as presented in this court, are: (1) The plaintiffs' action is one to specifically enforce a contract, that said contract is testamentary in character, was lacking the required testamentary witnesses, and consequently was null, void and unenforceable; (2) that regardless of the claimed legality of the contract specific performance is only a matter of grace and not of right and it will never be granted by equity where there would result hardship, unfairness, undue ad-

vantage, or an unconscionable result; (3) a contract to be specifically enforced by a court must be mutual in that at the time it was entered into it might be enforced by either of the parties against the other of them.

The plaintiffs maintain as a basis for affirmance the following: (1) The agreement as to the Cornwalls' acquisition of the Birdsall stock is not testamentary; (2) there was no inequity in the agreement of such a nature as to deny its specific performance; (3) there is no want of mutuality which would avoid specific performance; (4) equity has separate jurisdiction to deal with and quiet title to the property involved and in so considering the problem the court must observe the contract as a valid one.

I. It is our conclusion the agreement in controversy is not testamentary in character by reason of the nature of the instrument and the circumstances before and after it was executed. It is referred to as a memorandum of agreement. There are repeated references in it to the agreements therein mentioned. It has no features of a will. It is a contract which, in part, could be carried out during the life of the parties. By reason of the option or right-to-purchase feature in it the legal representatives of the respective parties were authorized to carry out the provisions relative to the sale of the shares. Such a provision in the form noted would not be incorporated in a will.

A will operates from and after the death of the maker. It is stated in Keck v. McKinstry, 206 Iowa 1121, 1128, 1129, 221 N.W. 851, 855: "An instrument by which the maker divests himself *in praesenti* of any part of his estate,—which grants an estate or interest *in praesenti*, though possession and enjoyment are postponed until after the death of the maker,—is not a will. Shaull v. Shaull, 182 Iowa 770, and cases post." That is the situation in the present case. The parties agreed to.a contemplated sale and purchase. It was an agreement which included conditions of sale both during the lifetime of the parties and upon their death.

In Strange v. State Tax Commission, 192 Miss. 765, 773, 7 So.2d 542, 543, we observe a case somewhat similar to the one here under consideration. In the cited case it was agreed in the event of the death of either of the parties to an agreement the survivor

was authorized to take the forty shares of stock involved upon the basis of the valuation of $10,000 to be paid to the estate of the decedent. The option of the survivor to purchase the stock was to be exercised within sixty days from the death of the other party. Although the principal question in the cited case pertains largely to the valuation and taxation of the property, there is a statement in the opinion which bears upon the question in the present controversy, as follows: "This instrument vested in praesenti in the survivor of these brothers the right to purchase this stock from the estate of the other. It is true the right was not to be exercised until the death of one of them, an event certain to happen but uncertain as to time; but when it did occur such exercise was based upon a right created and vested at the time of the execution of the agreement. Neither had the right to revoke the option-to-purchase provision. This was part of the consideration of the contract."

Fawcett v. Fawcett, 191 N. C. 679, 132 S.E. 796, is a case wherein the parties to a contract agreed any and all shares of stock in a bank owned by either of the parties should become the property of the survivor upon a par basis on the death of one of the parties. It was therein held such an agreement is not open to the objection that it is a testamentary disposition of property. See also In re Estate of Frayser, 401 Ill. 364, 82 N.E.2d 633; McKinnon v. McKinnon, 8 Cir., 56 F. 409; New England Trust Co. v. Spaulding, 310 Mass. 424, 38 N.E.2d 672; Chas. J. Smith Co. v. Anderson, 84 N. J. Eq. 681, 95 A. 358.

The defendants make particular claim to the applicability to the instant case of our holding in Burlington University v. Barrett, 22 Iowa 60, 74, 92 Am. Dec. 376, where this court held the instrument in question should be construed as a will. It should be kept in mind in the paper in question reference is made to a bequest. That is not true in the claimed agreement now before us. In the cited case there is a statement which can be applied to the present litigation, as follows: "* * * courts look further, and, weighing all the language as well as the facts and circumstances surrounding the parties and attending the execution of the instrument, give to it such construction as will effectuate the manifest intention of the maker and parties to it."

278

Applying the last quoted statement as a basis for consideration in this case we can find no facts or circumstances which would justify us in holding the instrument we are considering to be testamentary in character. We have given consideration to other cases cited by the defendants bearing on this phase of the litigation but we do not consider them controlling.

II. There is no dispute among the parties but that the building property has materially increased in value. There is evidence its valuation has increased to at least $155,000 and perhaps $175,000. It is also shown the property was worth $95,000 in 1941 at the time of the contract here involved. It is the defendants' claim to require them to sell Mrs. Birdsall's shares for $1000 per share would be inequitable and would result in unfairness and undue advantage.

In connection with the defendants' claim the plaintiffs' contentions were lacking in equity it is of interest to note the trial court's comments on this phase of the case. It stated:

"Because of some of the allegations in the pleadings it is appropriate to repeat that there is not the slightest evidence of any misconduct, fraud, concealment, overreaching, coercion, violation of any fiduciary relationship, breach of propriety, or misunderstanding on the part of anyone. If the agreement now appears profitable and to the advantage of the Cornwalls and the Bjornstads (as assignees of aliquot parts) I think it is because the Birdsalls wanted it that way.

"Mrs. Birdsall's estate is substantial in amount. Collateral heirs are the beneficiaries. Apparently the only one needing help has been provided for irrespective of the outcome of this action. There is no one crying for help because of need. There are no inequities appealing to the conscience of the court for correction."

Our review of the record sustains the conclusions reached by the trial court.

In Cities Service Oil Co. v. Viering, 404 Ill. 538, 553, 89 N.E.2d 392, 401, 13 A. L. R.2d 1448, the Illinois court commented on a claim similar to that made by the defendants in this case as follows: "The fact that the value of the property has increased materially does not warrant a refusal to carry out its terms.

In re Estate of Frayser, 401 Ill. 364, 82 N.E.2d 633; Forest Preserve Dist. v. Emerson, 341 Ill. 442, 173 N.E. 477. Where a contract is made for a consideration and without fraud and entered into fairly and understandingly between parties who are competent to contract, a court of equity will enforce it as a matter of right. In re Estate of Frayser, 401 Ill. 364, 82 N.E.2d 633; Smith v. Farmers' State Bank, 390 Ill. 374, 61 N.E.2d 557, 171 A. L. R. 1291; Forest Preserve Dist. v. Emerson, 341 Ill. 442, 173 N.E. 477. The courts can have no concern with the wisdom or folly of such a contract. In re Estate of Frayser, 401 Ill. 364, 82 N.E.2d 633; Stipanowich v. Sleeth, 349 Ill. 98, 181 N.E. 632. It is the general rule that inadequacy of consideration, exorbitance of price or improvidence in a contract will not, in the absence of fraud, constitute a defense to a suit for specific performance. Stipanowich v. Sleeth, 349 Ill. 98, 181 N.E. 632."

And in More v. Carnes, 309 Ky. 41, 57, 214 S.W.2d 984, 992, the Kentucky court made a similar statement, as follows: "It is true in the instant case that, as it turned out, an inequity resulted to the widow and children because the half interest of the deceased partner, appraised as of the date of his death, was more than twice the value of the insurance provided by the contract to pay for that half interest. This is a result to be regretted but is not a ground for voiding the contract if, as we have held herein, it is a binding, enforceable agreement. * * * Courts cannot deny enforcement of an otherwise valid contract merely because its enforcement would result in inequities in a particular case."

In Cohen Brothers Iron & Metal Co. v. Shackelford Brick Co., 197 Iowa 674, 687, 198 N.W. 318, 324, this court made a statement which applies to the present case, as follows: "But where it appears that two competent parties have fairly and understandingly, and without fraud or overreaching, entered into an unambiguous and definite contract for the sale of real estate and the payment of a definite price therefor, specific performance of the contract on the part of the vendee is a matter which a chancellor will rarely deny. The granting of specific performance of such a contract is not a mere matter of caprice on the part of a chancellor."

There is also a statement in Carson v. Mikel, 205 Iowa 657,

658, 659, 216 N.W. 60, 61, which announces the same holding as heretofore set out in this division, as follows: "It is contended that the contract is so harsh and unconscionable that a court of equity should not decree specific performance. The contract proved in the long run to be improvident, but a court of equity cannot relieve competent parties who enter into contracts that are not tainted by fraud, from the legal effects thereof because such contracts may be ill-advised or prove to be unprofitable or disadvantageous."

Another Iowa case bearing on the issue discussed in this division is: Orr v. Graybill, 237 Iowa 628, 644, 23 N.W.2d 414. And concerning the fluctuation in value of the property involved see Martin v. Toll, 196 Iowa 388, 391, 192 N.W. 806; Christians v. Christians, 241 Iowa 1017, 1022, 44 N.W.2d 431.

We find no evidence of inequity which would justify a court of equity in determining the contract should not be carried out.

■■ III. We hold there was sufficient mutuality of rights in the agreement to merit its enforcement. It should be kept in mind there was an option feature in it which was applicable to both parties. It is true by reason of the age of the Birdsalls they might not have had an opportunity to exercise their right to purchase the Cornwalls' shares. Nevertheless there can be no question but that this phase of the contract was binding on all parties to it. And as bearing on the question of mutuality of a contract it is stated in Meader v. Incorporated Town of Sibley, 197 Iowa 945, 950, 951, 198 N.W. 72, 74: "It is a well-established rule that, if the intention of the parties and the consideration on which an obligation is assumed by one party is that there shall be a corresponding obligation on the part of the other party, the law will imply such obligation. (Citing cases.)" This is the situation in the present case. "* * * a contract should be construed in favor of mutuality and of certainty and definiteness, * * *." 17 C. J. S., Contracts, section 318, page 736; Bitker & Gerner Co. v. Green Investment Co., 273 Wis. 116, 76 N.W.2d 549, 552.

There are other features of the question relative to the mutuality of the contract which we might discuss but we do not deem it necessary.

IV. A court of equity has jurisdiction to settle the affairs of a partnership. Johanik v. Des Moines Drug Co., 235 Iowa 679, 686, 17 N.W.2d 385. Equity has full power to give such relief as may be necessary to effect the general purposes of the litigation, including an action to quiet title. Utley v. Boone, 230 Iowa 979, 982, 299 N.W. 437.

We have not discussed all the questions and facts presented on this appeal. However we have considered such issues as appear essential to a determination of the litigation. We consequently hold the trial court was correct in determining the executors and trustees of the estate of Carrie G. Birdsall, deceased, should endorse the certificates of ownership in the Mc-Allister Block Building to Wilson Cornwall, R. M. Cornwall, C. Ben Bjornstad, and the trustees under the will of Otto A. Bjornstad. We therefore affirm.—Affirmed.

HAYS, C. J., and BLISS, OLIVER, GARFIELD, THOMPSON, LARSON, and PETERSON, JJ., concur.